**REVISED August 24, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50564

United States Court of Appeals
Fifth Circuit

**FILED**
August 7, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARCIANO MILLAN VASQUEZ, also known as Chano,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before KING, SOUTHWICK, and HO, Circuit Judges.

KING, Circuit Judge:

Just across the border from Eagle Pass, Texas, lies the city of Piedras Negras. A violent drug cartel, the Zetas, dominated the city. The cartel stocked vast warehouses in Piedras Negras with drugs and used the city as a base to smuggle them into the United States. The defendant, Marciano Millan Vasquez, was a hitman for the cartel and the so-called "plaza boss" of Piedras Negras. He directed the traffic in drugs and did whatever was required to protect the cartel's bottom line. He kidnapped, tortured, and killed scores of men, women, and children—often in brutal fashion. The victims were

No. 17-50564

informants, debtors, defectors, military, law enforcement, members of rival cartels, and anyone else unlucky enough to have drawn the cartel's ire.

A tip led to Vasquez's arrest and, ultimately, his trial on charges of drug trafficking and killing while engaged in various drug-trafficking crimes. The jury returned a verdict of guilty on all counts. Sentenced to seven lifetimes (plus 60 months) in prison, Vasquez appeals. On appeal, he raises an extraterritoriality challenge, claims a double jeopardy violation, and alleges that the district court botched its jury instructions. All of his challenges are subject to plain error review, and none of them surmount its high bar. At the center of this appeal is 21 U.S.C. § 848(e)(1), which punishes killing while engaged in certain major drug-trafficking crimes. Because the underlying drug-trafficking crimes reach extraterritorial conduct, we hold that § 848(e)(1) does too. And finding clear congressional intent to punish the killing in addition to the underlying drug trafficking, we hold that no double jeopardy violation occurs when a defendant is convicted for both. Vasquez's grievances with the jury instructions are meritless. We AFFIRM.

## I.

### A.

The Zetas cartel is an international drug-trafficking organization based in Mexico. It got its start as the security arm of another cartel. Eventually, however, the two organizations fractured. The Zetas cartel then became a drug-trafficking organization in its own right, stocking vast warehouses in Mexico with marijuana, cocaine, and methamphetamine—all ready for importation into the United States. But drug trafficking was not its only line of business. Kidnapping, extortion, and murder generated additional revenue for the cartel and helped maintain control over its bases (or "plazas").

2

No. 17-50564

Marciano Millan Vasquez was a hitman and drug trafficker with the Zetas cartel.[1] Over the years, he worked his way up to become the "plaza boss" of Piedras Negras, Coahuila, a city across the border from Eagle Pass, Texas. The Zetas had near total control over the state of Coahuila, and, within that, Vasquez controlled Piedras Negras. As plaza boss, Vasquez directed the flow of drugs across the border and had the power to order executions. He was also responsible for maintaining control of Piedras Negras, which he did by bribing and murdering public officials and law enforcement officers.

During his reign as plaza boss, Vasquez routinely killed and ordered his underlings to kill. The victims were suspected informants, competitors, defectors, debtors, those close to them, and countless others who drew Vasquez's ire for one reason or another.

Suspected informants were a frequent target. Rodolpho Reyes, Jr., a U.S. citizen, worked for the Zetas cartel but began cooperating with U.S. law enforcement in 2009. After law enforcement repeatedly intercepted shipments of drugs, Vasquez grew suspicious. He summoned Reyes to Mexico, where he tortured him until Reyes confessed and gave up the name of another informant. Vasquez then gave him some cocaine, told him to pray, shot him, dismembered his corpse, and burned it. Severino Abascal was another suspected informant. Vasquez, then just the deputy to the plaza boss, advised the then-plaza boss to kidnap and kill Abascal. After Abascal and his girlfriend disappeared, Abascal's father asked a friend linked to the cartel to look into it. The friend called the plaza boss, who told the friend that he and Vasquez had just finished "cooking" them—meaning that they had dissolved the bodies in acid or diesel gasoline.

---

[1] Vasquez does not challenge the sufficiency or reliability of the evidence presented at trial. We therefore summarize the testimony and exhibits offered at trial as uncontested.

No. 17-50564

The Zetas cartel also orchestrated mass slaughters. Pancho Cuellar was once a high-ranking member of the cartel. According to one witness who worked with him, he "was in charge of all of the cocaine movement in Piedras Negras." Cuellar—rumored to be working with law enforcement and indebted to the Zetas to the tune of $10 million—fled to the United States and began cooperating with law enforcement. In retaliation, the Zetas organized, according to one trial witness, "one of the largest massacres that ha[s] happened in Coahuila." Members of the cartel swiftly rounded up more than 30 people,[2] including children, and took them to a vacant lot outside Piedras Negras, where they shot them and disposed of their bodies. Vasquez helped to plan, coordinate, and, ultimately, carry out the round-up and the slaughter. The Zetas then rounded up hundreds more in the nearby town of Allende and murdered them as well.

Vasquez and the cartel also used murder to punish and intimidate those who stole from and owed money to them. The Zetas killed a man who laundered its money, as well as his friend and his brother, when it suspected that he had stolen from the cartel.[3] Another man, Jorge De Leon, smuggled drugs, firearms, and money for Vasquez but incurred a debt when he lost a shipment. When De Leon failed to pay by Vasquez's deadline, Vasquez kidnapped him and held him hostage. Vasquez demanded that De Leon's family and friends pay a $100,000 ransom.

---

[2] These numbers are drawn from witness estimates. The jury returned a special verdict form finding Vasquez guilty of these murders but listing the number of victims as "unknown."

[3] The Government does not point to any evidence linking Vasquez directly to these three murders. The jury nonetheless found Vasquez guilty of all three. On appeal, the Government characterizes Vasquez's role in these murders as aiding and abetting, which is the theory on which the court allowed them to be submitted to the jury. Regardless, Vasquez does not challenge the sufficiency of the evidence as to this murder or any other.

No. 17-50564

He then showed De Leon what would happen to him if they failed. Over the 13 days he was held hostage, De Leon testified that he was forced to watch one brutal murder after another. Vasquez and his underlings first dismembered four men and one woman in front of him, burning their corpses afterward. Four children suspected of working for a rival cartel and two men were "cut up" while De Leon was forced to watch. Three Mexican military personnel were shot right in front of him. And he was forced to watch as Vasquez dismembered and then burned a six-year-old girl in front of her parents. After they watched their daughter die, Vasquez murdered the parents too. Vasquez finally released De Leon when his mother raised $20,000 by selling her home. If he failed to raise an additional $100,000, Vasquez told him, he would suffer through the same horrors yet again. De Leon failed to raise the money. Fearing for himself and his family, he fled to the United States and brought his wife, son, and father with him.

The U.S. Marshals Service arrested Vasquez in San Antonio in July 2015. Based on a tip, they tracked him to a house registered to his common law wife. When asked his name, Vasquez told the marshals that he was Rigoberto Sanchez and gave them a false identification card. Although the marshals told Vasquez that they knew who he was, he initially continued to insist that he was Rigoberto Sanchez but ultimately confessed his real identity.

**B.**

A grand jury in the Western District of Texas returned a ten-count indictment against Vasquez. Count one of the indictment charged Vasquez with killing while engaged in offenses punishable under 21 U.S.C. §§ 841(b)(1)(A) or 960(b)(1), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Counts two, six, and eight charged conspiracy to possess marijuana, cocaine, and methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Counts three, four, and seven

5

No. 17-50564

charged conspiracy to import and distribute controlled substances, in violation of 21 U.S.C. §§ 952(a), 959(a), 960(a), 960(b)(1), and 963. Count five charged the employment of minors in drug operations, in violation of 21 U.S.C. § 861(a)(1) and 18 U.S.C. § 2. Count nine charged conspiracy to possess firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1), (o). Count ten charged false statements, in violation of 18 U.S.C. § 1001(a)(2).

After an 11-day trial, a jury found Vasquez guilty on all counts. As for the murder charges, the jury returned a special verdict form finding Vasquez guilty of every charged murder.[4]

Vasquez filed a post-verdict motion for a judgment of acquittal. He argued for the first time that 21 U.S.C. § 848(e)(1)(A) does not apply extraterritorially. He also argued, again for the first time, that the drug trafficking offenses were lesser-included offenses of § 848(e)(1)(A), and thus double jeopardy precluded convicting him of both. The district court denied the motion.

The district court then imposed seven consecutive terms of life imprisonment on counts one, two, three, four, six, seven, and eight. It imposed concurrent sentences of ten years' incarceration on count five and twenty years' on count nine. Finally, it imposed a consecutive sentence of five years' incarceration on count ten.

## C.

Convicted and sentenced to more than seven lifetimes' worth of imprisonment, Vasquez appeals. According to Vasquez, his murder convictions cannot stand because the statute under which he was convicted does not apply beyond the territory of the United States. He also argues that the district court

---

[4] The mass murders following Cuellar's defection were listed as a single entry labeled, "The Allende murders (an unknown number of persons)."

No. 17-50564

flubbed its jury instruction on the murder counts, allowing the jury to convict him even if it found no "substantive connection" between the murders and Vasquez's drug-trafficking crimes. These errors, Vasquez next contends, "spilled over" to taint the other counts, meaning that his remaining convictions cannot stand if we reverse on the murder counts. Finally, Vasquez claims that his drug-trafficking convictions are actually lesser-included offenses of his murder convictions, such that the Double Jeopardy Clause precludes punishing him for both.

In the sections that follow, we consider and reject each argument in turn.

## II.

We turn first to Vasquez's extraterritoriality argument.

## A.

The parties disagree about the standard of review. Vasquez contends that his extraterritoriality challenge is properly preserved. The Government contends that it is waived—that is, subject not to plain error review but to no review at all. Both parties are wrong.

Whether Vasquez preserved the argument depends on whether he raised it at the right time in the district court. Vasquez first argued that 21 U.S.C. § 848(e)(1)(A) does not apply extraterritorially in a post-verdict motion for acquittal. He filed no pretrial motion to dismiss the indictment. As we explain, Vasquez's challenge was to the sufficiency of the indictment and therefore should have been raised in a pretrial motion to dismiss.

Federal Rule of Criminal Procedure 12 governs the timing of pretrial motions. "A motion that the court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2). But other motions "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). This includes motions alleging "a defect in the indictment,"

such as the "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). If a party advances such an argument after the deadline for pretrial motions, then "the motion is untimely." Fed. R. Crim. P. 12(c)(3). The court may nonetheless consider the motion "if the party shows good cause." *Id.*

Extraterritoriality "is a question on the merits rather than a question of a tribunal's power to hear the case." *United States v. Rojas*, 812 F.3d 382, 390 (5th Cir.) (quoting *Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 107 n. 4 (5th Cir. 2014)), *cert. denied*, 136 S. Ct. 2421 (2016). In other words, an argument that a statute does not apply extraterritorially is not an argument that the court lacks jurisdiction. It thus does not fall into the category of motions that "may be made at any time while the case is pending." *See* Fed. R. Crim. P. 12(b)(2).

Nor could Vasquez's argument on appeal reasonably be characterized as a challenge to the sufficiency of the evidence. The Government did not charge murders only in the United States but then present evidence of murders only in Mexico. The indictment charged murders that took place in Mexico. And Vasquez has briefed only the purely legal question of whether the statute applies extraterritorially at all. The basis for that argument was "reasonably available" long before trial and could have been "determined without a trial on the merits." *See* Fed. R. Crim. P. 12(b)(3). Vasquez therefore should have raised it in a pretrial motion to dismiss the indictment, not in a post-verdict motion for a judgment of acquittal. *Cf. Rojas*, 812 F.3d at 390 n.3 (holding that the defendant did not preserve an extraterritoriality challenge "by arguing that the government lacked any evidence to establish that the cocaine in this case 'was intended for the United States in order for the United States to have jurisdiction over that because you have to show a specific violation of the United States law, not just that we enforce our law anywhere'").

8

No. 17-50564

Vasquez's argument is unpreserved, but it is not "waived." Before 2014, Rule 12 deemed a motion "waived" if not timely filed. *See, e.g.*, *United States v. Warren*, 728 F. App'x 249, 254-55 (5th Cir. 2018); 1A Charles Alan Wright & Andrew D. Leipold, *Federal Practice & Procedure* § 193 (4th ed. 2008). Our pre-amendment approach to Rule 12 ascribed great significance to the use of the word "waived." *See United States v. Chavez-Valencia*, 116 F.3d 127, 130 (5th Cir. 1997). "Waiver" ordinarily entails "the intentional relinquishment or abandonment of a known right." *See id.* Yet, Rule 12's language also applied to the inadvertent abandonment of a right, *see id.*—an abandonment known as "forfeiture," *see United States v. Olano*, 507 U.S. 725, 733 (1993). The distinction between the two types of abandonment matters greatly in a criminal case. A party's waiver of a right "extinguishes" any errors. *See id.* Forfeiture, by contrast, does not "extinguish" errors. *See id.* at 733-34. But it is not without consequence: the court may correct a forfeited error only if it satisfies the plain error standard. *See id.* at 732-37; *see also* Fed. R. Crim. P. 52(b). Before the 2014 amendment, we held that "'waiver,' as applied to [pretrial] motions . . . in Rule 12, must be interpreted to have its usual legal consequences."[5] *Chavez-Valencia*, 116 F.3d at 130.

The language about "waiver" was subsequently deleted, and the Rule now says that the motion is merely "untimely." Fed. R. Crim. P. 12(c)(3). The advisory committee explained that it revised the rule "to avoid possible confusion" stemming from the use of the word "waiver," given that Rule 12 "never required any determination that a party who failed to make a timely

---

[5] Our approach in particular cases decided before the amendment was nonetheless inconsistent. *Compare Chavez-Valencia*, 116 F.3d at 129-30, 134 (holding that failure to file pretrial motion to suppress evidence discovered during search precludes appellate review), *with United States v. Stevens*, 487 F.3d 232, 242 (5th Cir. 2007) (reviewing an argument raised for the first time on appeal that unwarned custodial statements should have been suppressed for plain error).

motion intended to relinquish a defense, objection, or request." Fed. R. Crim. P. 12(c) advisory committee's note to 2014 amendment. "The Advisory Committee Notes are instructive on the drafters' intent in promulgating the federal rules." *United States v. Navarro*, 169 F.3d 228, 237 (5th Cir. 1999). Taken together, the amendment and note make clear that our prior approach does not endure. *Cf. Warren*, 728 F. App'x at 255 n.5 ("[D]ecisions [that] pre-date the 2014 amendments which eliminated the word 'waiver[]' . . . do not assist our analysis of the current rule."). They clarify that Rule 12 recognizes the traditional distinction between forfeiture and waiver. Thus, we review Vasquez's untimely—that is, forfeited—extraterritoriality challenge for plain error. *Cf. Rojas*, 812 F.3d at 390-91 & n.3 (reviewing defendant's forfeited extraterritoriality challenge for plain error despite concluding that it should have been raised in a pretrial motion).

Vasquez bears the burden of proving plain error. *See United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). To do so, he must prove an error that was "clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). The error must affect his "substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 734). Even if he can make those showings, we have "*discretion* to remedy the error—discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."'" *Id.* (alteration in original) (quoting *Olano*, 507 U.S. at 736).

### B.

"Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *EEOC v. Arabian Am. Oil Co. ("Aramco")*, 499 U.S. 244, 248 (1991), *superseded by statute*, Civil Rights Act of 1991, Pub.

No. 17-50564

L. 102-166, § 109, 105 Stat. 1071, 1077-78 (1991) (codified at 42 U.S.C. §§ 2000, 2000e-1, 12111, 12112). But the judiciary is loath to hold that a statute applies extraterritorially absent a clear indication from Congress that it does. *See Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013). This presumption against extraterritoriality is a canon of statutory interpretation, not a limit on Congress's power. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010), *superseded by statute*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P(b), 124 Stat. 1376, 1864-65 (2010) (codified at 15 U.S.C. §§ 77v, 78aa, 80b-14); *see Kiobel*, 569 U.S. at 115. "It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison*, 561 U.S. at 255; *see also Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007) (noting the "presumption that United States law governs domestically but does not rule the world"). And it "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel*, 569 U.S. at 116 (quoting *Aramco*, 499 U.S. at 248).

The Supreme Court has developed a two-step framework to apply the presumption. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).[6] First, the court "ask[s] whether the presumption against

---

[6] Despite relying on *RJR Nabisco* heavily in its brief, the Government for the first time at oral argument took the puzzling position that *RJR Nabisco* does not apply to criminal cases. We reject this argument. RICO is a hybrid statute authorizing criminal prosecution, 18 U.S.C. § 1963, civil enforcement, *id.* § 1964(b), and private civil actions, *id.* § 1964(c), for violations of its uniform set of prohibited activities, *id.* § 1962. The *RJR Nabisco* Court *separately* applied the presumption to RICO's substantive prohibitions—which it described as "criminal offenses," 136 S. Ct. at 2096—and its private right of action, *see id.* at 2099-100.

Perhaps more to the point, the Supreme Court has indicated in dictum that the presumption applies to criminal statutes. *See Small v. United States*, 544 U.S. 385, 389 (2005) ("That presumption would apply . . . were we to consider whether this statute[, 18 U.S.C. § 922(g)(1),] prohibits unlawful gun possession abroad as well as domestically."). And since *RJR Nabisco* was decided, four circuits have applied it in criminal cases. *See United States*

No. 17-50564

extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* If (and only if) there is no such indication, the court proceeds to the second step. *See id.* at 2101 & n.5; *Morrison*, 561 U.S. at 267 n.9. At this step, the court "determine[s] whether the case involves a *domestic* application of the statute." *RJR Nabisco*, 136 S. Ct. at 2101 (emphasis added). To do so, it "look[s] to the statute's 'focus.'" *Id.* Determining the statutory focus, the *RJR Nabisco* court explained, allows the court to determine whether the case involves merely a domestic application:

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*Id.*

## C.

To the first step, then: does § 848(e)(1)(A) "give[] a clear, affirmative indication that it applies extraterritorially?" *RJR Nabisco*, 136 S. Ct. at 2101. *RJR Nabisco* effectively mandates that we answer in the affirmative. Like the statute in that case, a conviction under § 848(e)(1)(A) requires proof of

---

v. Sitzmann*, 893 F.3d 811, 822 (D.C. Cir. 2018) (per curiam); *United States v. Ubaldo*, 859 F.3d 690, 700-01 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 704 (2018); *United States v. Valenzuela*, 849 F.3d 477, 484-85 & n.3 (1st Cir.), *cert. denied*, 138 S. Ct. 117 (2017); *see also United States v. Gasperini*, 729 F. App'x 112, 113-14 (2d Cir. 2018).

The case on which the Government relies, *United States v. Bowman*, held that the presumption does not apply to criminal statutes intended to protect the Government "itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." 260 U.S. 94, 98 (1922). Unfortunately for the Government, the Court distinguished "[c]rimes against private individuals or their property, like . . . murder," to which the presumption *does* apply. *Id.* Moreover, three of the defendants were U.S. citizens, and the Court reserved the question of whether the statute would apply to a non-U.S. national codefendant. *See id.* at 101.

underlying offenses that themselves apply extraterritorially. We therefore hold that § 848(e)(1)(A) applies extraterritorially to the same extent as those underlying offenses.

In *RJR Nabisco*, the Supreme Court considered the extraterritorial application of the Racketeer Influence and Corrupt Organizations Act, more commonly known as "RICO," 18 U.S.C. §§ 1961-1968. RICO prohibits four types of acts, each "founded on the concept of racketeering activity." *RJR Nabisco*, 136 S. Ct. at 2096-97 (citing 18 U.S.C. § 1962). "The statute defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates." *Id.* at 2096. That many of those offenses "plainly appl[ied] to at least some foreign conduct"—or, in one case, exclusively to foreign conduct—was an "obvious textual clue" that Congress intended for RICO to apply extraterritorially. *Id.* at 2101-02.

The Court rejected the defendant's argument that RICO did not apply extraterritorially because "'RICO itself' does not refer to extraterritorial application." *Id.* at 2102. "[A]n express statement of extraterritoriality," the Court explained, "is not essential." *Id.* Rather, a court must look for a "clear *indication*," not a clear *statement*, "of extraterritorial effect." *Id.* That search extends to both text and context. *See id.* With RICO, the Court declared, "[c]ontext is dispositive." *Id.* Congress had defined "racketeering activity" to include offenses that expressly apply extraterritorially. *See id.* "Short of an explicit declaration, it is hard to imagine how Congress could have more clearly indicated that it intended RICO to have (some) extraterritorial effect." *Id.* at 2102-03.

The Court made clear that RICO's extraterritorial application was limited to its terms. *See id.* "[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* at 2102 (quoting *Morrison*, 561 U.S. at 265). RICO's

extraterritorial application is limited by its predicate offenses. "A violation of § 1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad . . . ." *Id.* at 2103. But if the predicates do not apply extraterritorially, then neither does RICO. *See id.* at 2102-03.

We set out § 848(e)(1)(A) in full:

(1) In addition to the other penalties set forth in this section—

(A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death; . . . .

The structure of the statute resembles RICO. It sets forth penalties for intentionally killing or counseling, commanding, inducing, procuring, or causing a killing. 21 U.S.C. § 848(e)(1)(A). But, as relevant here, it only penalizes those actions if committed by "any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title." *Id.* In other words, liability under § 848(e)(1)(A) requires that the offender first "engag[e] in" one of the predicate offenses. *See id.*; *United States v. Guerrero*, 813 F.3d 462, 466 (2d Cir.) ("The statute requires the Government to prove that the defendant was engaged in a predicate drug offense at the time of the intentional murder."), *cert. denied*, 137 S. Ct. 98 (2016); *cf. United States v. Villarreal*, 963 F.2d 725, 728 (5th Cir. 1992) (describing drug offenses under subsection (e)(1)(B) as "predicate offenses").

No. 17-50564

The predicate offenses outlaw different types of acts.[7] As relevant here, § 841(a) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). By contrast, § 960(a) prohibits two types of offenses that are relevant in this case. *See id.* § 960(a). First, it prohibits "knowingly or intentionally import[ing] or export[ing] a controlled substance" in violation of the law. *Id.* § 960(a)(1) (referencing the labeling, importation, exportation, and registration regulations in 21 U.S.C. §§ 852, 952, 953, 957). Second, it prohibits "manfactur[ing], possess[ing] with intent to distribute, or distribut[ing] a controlled substance" in violation of § 959. *Id.* § 960(a)(3). The indictment alleged that Vasquez violated § 959(a). That section prohibits manufacturing or distributing a schedule I or II substance "intending, knowing, or having reasonable cause to believe that such substance . . . will be unlawfully imported into the United States." *Id.* § 959(a). Critically, § 959 provides that it "is intended to reach acts of manufacture or distribution *committed outside the territorial jurisdiction of the United States." Id.* § 959(d) (emphasis added).

Section 848(e)(1)(A)'s predicate offenses "plainly apply to at least some foreign conduct." *See RJR Nabisco,* 136 S. Ct. at 2101. This court has held that § 841(a)(1) applies extraterritorially "so long as it is clear that the intended distribution would occur within the territorial United States." *United States v. Baker*, 609 F.2d 134, 139 (5th Cir. 1980). As for § 960, we have held that "Congress intended that the prohibition of attempts to import drugs should apply to attempts made wholly outside of our borders." *See United States v.*

---

[7] Section 848(e)(1)(A) references §§ 841(b)(1)(A) and 960(b)(1), which set forth penalties for violations of §§ 841(a) and 960(a). Sections 841(a) and 960(a) identify the prohibited conduct. The referenced penalty provisions set forth penalties for the largest amounts of drugs.

*Perez-Herrera*, 610 F.2d 289, 291 (5th Cir. 1980). Even were we writing on a blank slate, importation and exportation, by definition, implicate extraterritorial conduct. *See, e.g.*, Import, *Black's Law Dictionary* (10th ed. 2014) ("The process or activity of bringing foreign goods into a country."); Export, *Black's Law Dictionary* (10th ed. 2014) ("The process of transporting products or services to another country."). Even more fatal to Vasquez's argument is § 959(a)'s *express statement* of extraterritorial effect. *See* 21 U.S.C. § 959(d); *United States v. Lawrence*, 727 F.3d 386, 392-93 (5th Cir. 2013). Were that not enough, we have held that the statutes prohibiting conspiracies to commit either of the predicate offenses, 21 U.S.C. §§ 846, 963, apply to purely extraterritorial conduct intended to affect the United States. *See Rojas*, 812 F.3d at 392-93; *Lawrence*, 727 F.3d at 395; *United States v. Toro*, 840 F.2d 1221, 1235 (5th Cir. 1988); *United States v. Loalza-Vasquez*, 735 F.2d 153, 156 (5th Cir. 1984).

The *RJR Nabisco* Court found "a clear, affirmative indication" that Congress intended for RICO to apply extraterritorially because "a number of [RICO] predicates . . . apply to at least some foreign conduct." 136 S. Ct. at 2101-02. Section 848(e)(1)(A) has a leg up on RICO in overcoming the presumption against extraterritoriality. While a "number" of RICO predicates "apply to at least some foreign conduct," *all* of § 848(e)(1)(A)'s predicates do. The inclusion of just *some* extraterritorial predicates was enough for the *RJR Nabisco* Court to find a "clear, affirmative indication" that Congress intended for RICO to apply to at least some foreign conduct. *See id.* at 2102-03. The Court explained, "Short of an explicit declaration, it is hard to imagine how Congress could have more clearly indicated that it intended RICO to have

(some) extraterritorial effect." *Id.* But Congress did so here. It crafted an offense based on predicate acts that all apply extraterritorially.[8]

Vasquez argues that § 848(e)(1)(A) does not apply extraterritorially because it does not state so explicitly. This is a misunderstanding of the law. The presumption against extraterritoriality requires a "clear indication of extraterritorial effect," not "an express statement." *RJR Nabisco*, 136 S. Ct. at 2102. Put differently, the presumption against extraterritoriality is not a "clear statement rule." *Morrison*, 561 U.S. at 265. The Supreme Court has never required that Congress recite "this law applies abroad" to overcome it. *Id.* A clear indication is all that is required. *See RJR Nabisco*, 136 S. Ct. at 2102. And Congress can hardly indicate extraterritorial effect more clearly than by incorporating extraterritorial predicates into the definition of a criminal offense. *See id.* at 2102-03.

Because the scope of § 848(e)(1)(A)'s extraterritorial application is limited by its underlying offenses, *see id.* at 2102, we would normally consider whether the indictment nonetheless "allege[s] impermissibly extraterritorial violations," *id.* at 2105. In other words, we would consider whether the predicate offenses apply to the extraterritorial conduct alleged to violate them. Vasquez does not address this issue and has therefore forfeited on appeal any argument that the indictment alleges impermissibly extraterritorial violations. *See Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993). Even if

---

[8] The Government relies heavily on the legislative history of the act that added subsection (e)(1) to 21 U.S.C. § 848. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7001, 102 Stat. 4181, 4387-88. We do not resort to legislative history here, particularly because text and context are decisive. Even so, the legislative history is not particularly helpful on its own terms. The legislative history is sparse because the relevant provisions were enacted through introduction, debate, and amendment on the floor of Congress. *United States v. Aguilar*, 585 F.3d 652, 659 n.3 (2d Cir. 2009). The Government therefore relies solely on floor statements— "among the least illuminating forms of legislative history," *Trump v. Hawaii*, 138 S. Ct. 2392, 2413 (2018) (quoting *N.L.R.B. v. SW Gen., Inc.,* 137 S. Ct. 929, 943 (2017))—most of them concerning an unsuccessful proposed amendment to a prior act.

he had not, the indictment clearly alleges permissible extraterritorial applications: it repeatedly alleges that Vasquez knew and intended that controlled substances would be—and, in fact, were—imported into and distributed within the United States.[9] *Cf.* 21 U.S.C. § 959(d); *Lawrence*, 727 F.3d at 392-94; *Perez-Herrera*, 610 F.2d at 291; *Baker*, 609 F.2d at 139.

In short, there is a clear, affirmative indication of congressional intent that § 848(e)(1)(A) apply extraterritorially. The presumption against extraterritoriality has therefore been overcome. Looking to the statutory "focus" to determine whether the case involves a domestic application is therefore unnecessary. *See RJR Nabisco*, 136 S. Ct. at 2103-04.[10]

### D.

Congress clearly and affirmatively indicated that it intended for § 848(e)(1) to apply extraterritorially—at least to the extent that the underlying predicate offenses do. Vasquez led a vast drug-trafficking and distribution conspiracy, and therefore the underlying predicate offenses would apply to his extraterritorial conduct. The district court did not err—plainly or otherwise—by concluding that § 848(e)(1) applies extraterritorially.

### III.

Vasquez next argues that the district court should have further defined the "engaging in" element of § 848(e)(1)(A). According to Vasquez, the district court erred by simply reciting the statutory language. By doing so, he claims,

---

[9] There was abundant trial evidence proving these allegations, including testimony from coconspirators, informants, and law enforcement officers.

[10] We also typically consider "whether applying a statute extraterritorially violates due-process principles." *Rojas*, 812 F.3d at 393. That inquiry demands a link between the offense conduct and the United States sufficient to put the defendant on notice of the possibility of prosecution here. *See id.* Vasquez has not argued that applying the statute extraterritorially to him violates the Due Process Clause. He has therefore forfeited any such argument on appeal. *See Yohey*, 985 F.2d at 224-25. Even so, Vasquez was clearly on notice that he was subject to prosecution in the United States. Indeed, he repeatedly murdered informants precisely to avoid that outcome.

it allowed the jury to convict based on a mere temporal connection between the killings and the drug trafficking, rather than the "substantive connection" some courts have required. Reviewing for plain error, we conclude otherwise.

## A.

Vasquez never requested further definition of the "engaging in" element in the district court. We therefore review for plain error. *United States v. Percel*, 553 F.3d 903, 908-09 (5th Cir. 2008). "[W]hen a jury instruction omits or significantly misstates an essential element of an offense, the error may be severe enough to meet the plain-error standard." *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018) (quoting *United States v. Brown*, 553 F.3d 768, 785 (5th Cir. 2008)). Still, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). For the instruction to be plain error, it must "have meant the difference between acquittal and conviction." *Id.* (quoting *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001)). In making that determination, we consider "the entire charge and evidence presented against" Vasquez. *McClatchy*, 249 F.3d at 357 (quoting *United States v. Sellers*, 926 F.2d 410, 417 (5th Cir. 1991)).

## B.

Section 848(e)(1)(A) applies only if the defendant is "engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b) of this title." 21 U.S.C. § 848(e)(1)(A). The district court instructed the jury that it was required to find the following beyond a reasonable doubt:

*First:*      That an individual was intentionally killed;

*Second:*   That the defendant killed the individual or that the defendant counseled, commanded, induced, procured, or caused the intentional killing of the individual; and

*Third:*     That the defendant did so while engaged in offenses punishable under Title 21, United States Code,

No. 17-50564

Section 841(b)(l)(A) or Title 21, United States Code,
Section 960(b)(l).

The court did not further define "engaged in."

This is an issue of first impression—a circumstance that bodes ill for Vasquez. *Cf. SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 783 (5th Cir. 2017) (noting that a question of first impression generally cannot form the basis for plain error). This court has not further defined the "engaging in" element. Even our pattern jury instructions do not include instructions for a violation of § 848(e)(1)(A). *See* Comm. on Pattern Jury Instructions, Dist. Judges Ass'n, Fifth Circuit, *Pattern Jury Instructions (Criminal Cases)* § 2.96, 475-78 (2015).

The courts of appeals to consider the issue have all held that § 848(e)(1)(A)'s "engaging in" element requires a "substantive, and not merely temporal, connection" between the murder and the predicate offense. *See United States v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009); *United States v. Jones*, 101 F.3d 1263, 1267 (8th Cir. 1996); *United States v. Tipton*, 90 F.3d 861, 887 (4th Cir. 1996); *United States v. Chandler*, 996 F.2d 1073, 1096-98 (11th Cir. 1993). Of course, a robust consensus among the courts of appeals can support a finding of plain error. *See United States v. Hope*, 545 F.3d 293, 297 & n.17 (5th Cir. 2008). But the core question is not simply whether a substantive connection was required—a proposition the district court neither accepted nor rejected. Instead, the real question is whether, even assuming it was required, the district court plainly erred by reciting the statutory language without elaborating further on the "engaging in" element.

If the district court erred by not further defining the "engaging in" element, its error was hardly "clear or obvious." Not only has this circuit not defined the "engaging in" element, it has not even been precisely defined by those circuits holding that it requires a "substantive connection." *See, e.g.*,

20

*Aguilar*, 585 F.3d at 661 n.5. And Vasquez's preferred description of the "substantive connection" requirement is drawn from a dissent. *See Hager*, 721 F.3d at 213 (Wynn, J., dissenting). Vasquez would have us hold that the district plainly erred by not explaining to the jury that it was required to find that the "primary" or "predominant" purpose of the murders was to advance the drug conspiracy. Yet even the circuits requiring a substantive connection have rejected this standard. *See Hager*, 721 F.3d at 181; *Aguilar*, 585 F.3d at 660. Not only would adopting the "substantive connection" standard require an extension of this circuit's precedent, but adopting Vasquez's preferred formulation would require a split with two circuits that have adopted it. The district court did not commit plain error by declining to do so without any request from Vasquez. *See Hope*, 545 F.3d at 297 & n.17.

What is more, it is not even clear that the district court's instruction would be deemed error in the circuits that have adopted the "substantive connection" standard. Those courts have affirmed convictions based on jury instructions identical or similar to the one given in this case. *Cf., e.g.*, *Tipton*, 90 F.3d at 887 (affirming a jury instruction that did not further define the "engaging in" element despite "conced[ing] that the substantive connection [was] not as clearly expressed as it might be"); *Chandler*, 996 F.2d at 1097-98 (finding no plain error where the district court did not mention the substantive connection requirement but noted that murder charge was "built upon" the continuing criminal enterprise charge).

Even if erroneous, the instruction did not, by any stretch of the imagination, "mean[] the difference between acquittal and conviction." *McClatchy*, 249 F.3d at 357 (quoting *United States v. Anderson*, 987 F.2d 251, 256 (5th Cir. 1993)). For each of the charged murders, there was evidence that Vasquez's drug trafficking was a primary motivation. Vasquez murdered and ordered the murders of Government informants to punish them and deter

21

others. He participated in a mass slaughter to punish a high-level member of the cartel who defected and became a cooperator. He dismembered and murdered people to intimidate a man who owed him a drug-related debt while holding that man hostage. He ordered the murders of children working for a rival cartel and Mexican military personnel. Even if it had been admonished to search for a "substantive connection," we harbor no doubt that the jury still would have returned a verdict of guilty as to count one.

Vasquez challenges none of this evidence. Instead, he asserts without any citation to the record that it is impossible to determine whether the jury found the appropriate connection for any given murder. Even assuming for the sake of argument that the instruction was erroneous, Vasquez's mere speculation that the jury may not have found a substantive connection for some of the many charged murders is not enough to demonstrate a "likelihood" that the instruction "could have meant the difference between acquittal and conviction," *see McClatchy*, 249 F.3d at 357—particularly in light of the overwhelming and unchallenged evidence that the murders were in fact intended primarily to further and protect Vasquez's drug-trafficking enterprise.[11]

---

[11] It is not clear whether Vasquez also intended to challenge the aiding and abetting instruction. His failure to clearly identify this as a potential basis for relief forfeits the argument on appeal. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010). The argument also fails on the merits. There is no risk that the jury found that the murders took Vasquez by surprise but found him guilty simply because he joined the drug-trafficking conspiracy. The jury was instructed that an aider or abettor must "share[] the criminal intent of the principal." And Section 848(e)(1)(A) requires intent to kill, not just intent to engage in drug trafficking. *See* 21 U.S.C. § 848(e)(1)(A). Even assuming the instructions were incorrect, any error was harmless. A conviction required the jury to find that Vasquez committed only one, specific murder. *See, e.g.*, *United States v. Baytank (Hous.), Inc.*, 934 F.2d 599, 609 (5th Cir. 1991). On the special verdict form, the jury found him guilty of every murder alleged, including several he indisputably committed as a principal.

No. 17-50564

Vasquez has not demonstrated that the jury instruction was plainly erroneous.[12]

## IV.

Vasquez finally argues that convicting him of both the predicate drug offenses and the § 848(e)(1)(A) offense violated the Double Jeopardy Clause. In his view, the drug offenses are lesser-included offenses of § 848(e)(1)(A). Therefore, he insists, convictions for both are multiplicitous. Again reviewing for plain error, we conclude otherwise.

## A.

Vasquez first raised his multiplicity challenge in a post-verdict motion for a judgment of acquittal. "A claim that convictions are multiplicitous cannot be raised for the first time on appeal; such a claim must be raised by motion before trial." *United States v. Ogba*, 526 F.3d 214, 232 (5th Cir. 2008); *see* Fed. R. Crim. P. 12(b)(3)(B)(ii). Prior to 2014, the failure to raise the issue in a pretrial motion resulted in waiver. *See United States v. Dixon*, 273 F.3d 636, 642 (5th Cir. 2001). Yet, as we previously explained, our review under the current version is for plain error. To the extent that Vasquez now challenges his *convictions* as multiplicitous, we review for plain error.

The Government concedes that this court will review Vasquez's challenge to his consecutive sentences de novo. That concession is irrelevant. "A party cannot waive, concede, or abandon the applicable standard of review." *United States v. Escobar*, 866 F.3d 333, 339 (5th Cir. 2017) (per curiam) (quoting *Ward v. Stephens*, 777 F.3d 250, 257 n.3 (5th Cir. 2015)). The Government's concession spots Vasquez an argument he did not make in the district court and has not made on appeal. Vasquez has never argued that the

---

[12] Because we perceive no defect in Vasquez's conviction under § 848(e)(1)(A), we need not consider his argument that "spillover prejudice" from the allegedly improper § 848(e)(1)(A) conviction tainted his remaining convictions.

*cumulative sentences* violated double jeopardy, just the multiple convictions. To be sure, his section heading in the district court argued that the district court should vacate both his convictions and "punishments," but the body of his argument addressed only the convictions. By that time, sentencing had not occurred, so there were no "punishments" to be vacated. Nor did Vasquez raise the issue at sentencing, which would have been the appropriate time to challenge his sentence as multiplicitous. On appeal, he again mentions "multiplicitous punishment" in a section heading but addresses only his convictions in the body of his argument. Alluding to an argument in a section heading is insufficient to present it on appeal. *See Norris v. Causey*, 869 F.3d 360, 373 n.10 (5th Cir. 2017); *Royal v. Tombone*, 141 F.3d 596, 599 n.3 (5th Cir. 1998).

The Government is therefore incorrect that this court will review Vasquez's challenge to his cumulative sentences de novo. Vasquez has not briefed any such challenge for us to consider, and we decline to take it up on our own initiative. *Cf. United States v. Willingham*, 310 F.3d 367, 371 (5th Cir. 2002) (declining to consider an issue not briefed on appeal).

We therefore review Vasquez's multiplicity challenge to his convictions for plain error.

**B.**

The Double Jeopardy Clause commands that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause at its core prevents a defendant from being tried more than once for a single offense. *Missouri v. Hunter*, 459 U.S. 359, 365 (1983). But even a single trial can trigger its proscriptions. "'Multiplicity' is the charging of a single offense in several counts." *United States v. Reedy*, 304 F.3d 358, 363 (5th Cir. 2002) (quoting 1A Charles Alan Wright et al., *Federal Practice and Procedure* § 142 (3d ed. 1999)). Multiplicity invokes the clause's

proscription "against multiple punishments for the same offense."[13] *Ogba*, 526 F.3d at 232 (quoting *Whalen v. United States*, 445 U.S. 684, 688 (1980)). What the clause prohibits, however, is not the imposition of cumulative punishment but the imposition of "greater punishment than the legislature intended." *Hunter*, 459 U.S. at 366. "[S]imply because two criminal statutes may be construed to proscribe the same conduct . . . does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes." *Id.* at 368.

"There are at least two species of multiplicity challenges," but this appeal implicates only one. *United States v. Woerner*, 709 F.3d 527, 539 (5th Cir. 2013). That species involves two overlapping statutory provisions that arguably punish the same conduct. *See id.*; *Reedy*, 304 F.3d at 363. Our analysis entails two steps. We first look for a "'clear indication' of legislative intent to permit cumulative punishment for one offense under two separate statutes." *Ogba*, 526 F.3d at 233; *see Hunter*, 459 U.S. at 366-69. Second, absent such an indication, we apply the *Blockburger* "same elements" test to ask whether the two statutory provisions define a single offense. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each

---

[13] Although Vasquez would still be subject to a life sentence on count one if the remaining counts were vacated, the additional convictions are still cumulative punishment because the district court imposed a special assessment for each count. *See Rutledge v. United States*, 517 U.S. 292, 302 (1996); *Ogba*, 526 F.3d at 237-38. Moreover, we have deemed the final two prongs of the plain error standard satisfied even in cases where the sentence will be the same on remand because of the special assessments, "the collateral effects of sentences," and the plea negotiation leverage prosecutors gain from multiplying offenses. *Ogba*, 526 F.3d at 237-38. Our analysis thus focuses on the first two prongs of the plain error standard.

provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

*Blockburger* defines a rule of statutory construction. *Hunter*, 459 U.S. at 366. It is "not a constitutional rule requiring courts to negate clearly expressed legislative intent." *Id.* at 368. Rather, it simply reflects the presumption "that Congress ordinarily does not intend to punish the same offense under two different statutes." *Whalen v. United States*, 445 U.S. 684, 692 (1980). And it applies only where Congress has not clearly spoken to the issue: "Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Hunter*, 459 U.S. at 368-69.

To divine Congress's intent, we start with the text of the statute. *United States v. Singleton*, 16 F.3d 1419, 1425 & n.31 (5th Cir. 1994). Section 848(e)(1) by its terms applies "*[i]n addition to* the other penalties set forth in this section." 21 U.S.C. § 848(e)(1). Language expressly imposing punishment "in addition to" other penalties indicates congressional intent to impose cumulative punishment. *See Singleton*, 16 F.3d at 1425. In *Hunter*, for instance, the Supreme Court found "crystal clear" legislative intent to impose cumulative punishment where the statute provided that any "punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law." 459 U.S. at 362, 368 (quoting Mo. Ann. Stat. § 559.225 (West 1978)); *see also Singleton*, 16 F.3d at 1425 (finding clear congressional intent to impose cumulative punishment where the statute provided that any punishment would be "in addition to the punishment provided" for the predicate offense (quoting 18 U.S.C. § 924(c)(1)) (emphasis removed)).

26

No. 17-50564

Although we have not previously considered the precise question presented here, our caselaw on a similar issue forecloses Vasquez's argument, particularly on plain error review. In *United States v. Villarreal*, we considered whether § 848(e)(1)(B)[14] created an offense separate from its predicates or was merely a sentencing enhancement. *See* 963 F.2d at 727. The question we confronted in *Villarreal* was slightly different; the analysis was entirely the same. The key issue there, as here, was congressional intent to create separate criminal offenses, and our analysis relied heavily on a Supreme Court Double Jeopardy case. *See id.* at 727-28 (citing *United States v. Garrett*, 471 U.S. 773 (1985)). Ultimately, we determined that § 848(e)(1)(B) created a separate offense, not a sentencing enhancement. *See id.* at 728. "The crime is based upon predicate offenses, but is clearly separate from and in addition to those offenses," we explained. *Id.* We were therefore "convinced that Congress created a substantive offense in 21 U.S.C. § 848(e)(1)(B) and that its 'language, structure, and . . . history . . . show in the plainest way that Congress intended [it] to be a separate criminal offense which was punishable *in addition to, and not as a substitute for*, the predicate offenses.'" *Id.* (alterations in original) (emphasis added) (quoting *Garrett*, 471 U.S. at 779); *accord United States v. NJB*, 104 F.3d 630, 633-35 (4th Cir. 1997) (reaching the same conclusion in a case involving subsection (A)).

---

[14] This is the subsection that punishes murders of law enforcement officers "during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation" of 21 U.S.C. §§ 801-904, 951-971. *See* 21 U.S.C. § 848(e)(1)(B). Subsection (B) covers a broader range of predicate offenses that includes the predicate offenses appearing in subsection (A). Both subsections fall under the heading that provides that they apply "[i]n addition to the other penalties set forth in this section." 21 U.S.C. § 848(e)(1). Even more relevant, the specific predicate offenses in *Villarreal* were possession of marijuana with intent to distribute and conspiracy to do the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846, respectively. 963 F.2d at 727. *Villarreal* is therefore not distinguishable on the basis that it involves subsection (B).

No. 17-50564

Every court of appeals to consider the question has concluded that § 848(e)(1)(A) sets forth separate offenses—offenses for which the defendant may be prosecuted, convicted, and punished *in addition to* the underlying predicate drug-trafficking offenses. *See United States v. Honken*, 541 F.3d 1146, 1154-58 (8th Cir. 2008); *United States v. Collazo-Aponte*, 216 F.3d 163, 200 (1st Cir. 2000), *cert. granted in part and judgment vacated*, 532 U.S. 1036 (2001); *United States v. Snow*, 48 F.3d 198, 200 (6th Cir. 1995); *cf. United States v. McCullah*, 76 F.3d 1087, 1104-05 (10th Cir. 1996) (reaching the same conclusion regarding the continuing criminal enterprise predicate). All the caselaw, binding and persuasive, thus runs against Vasquez. Under the circumstances, there can be no plain error. *See United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010).

Because Congress made clear its intention to authorize cumulative punishment, the "court's task of statutory construction is at an end." *Hunter*, 459 U.S. at 369. That is, we need not undertake the *Blockburger* "same elements" analysis. *See id.* Section 848(e)(1)(A) sets forth an offense separate from—and punishable in addition to—its predicates. Vasquez's murder and drug-trafficking convictions are therefore not multiplicitous. The district court committed no plain error.[15]

---

[15] There is perhaps a colorable argument—one Vasquez does not make—that the penalties for violations of §§ 841(b)(1)(A) and 960(b)(1) are not "penalties set forth in *this section*," meaning § 848. The sole circuit to confront this argument has rejected it. *See NJB*, 104 F.3d at 633 ("[Section] 848(e) cannot be a penalty enhancement that only applies 'in addition to the other penalties set forth in this section' because, in fact, § 848(e) does not apply solely to § 848 offenses."). Several district courts have also rejected it as "absurd." *See United States v. Hall*, 419 F. Supp. 2d 279, 289 (E.D.N.Y. 2005); *United States v. Honken*, 271 F. Supp. 2d 1097, 1111 (N.D. Iowa 2003), *aff'd* 541 F.3d 1146. Moreover, accepting it would very likely require overruling *Villarreal*, at least in part. That we cannot do. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). In short, Vasquez does not make this argument, it is in tension with our precedent, and accepting it would require creating a circuit split with the one court of appeals to address it. Such is not plain error. *See Trejo*, 610 F.3d at 319.

No. 17-50564

**V.**

For the foregoing reasons, we AFFIRM Vasquez's convictions and sentence.