*United States v. Aquart*

# In the
# United States Court of Appeals
# for the Second Circuit

———————

AUGUST TERM 2022

No. 21-2763-cr

UNITED STATES OF AMERICA,
*Appellee*,

v.

AZIBO AQUART, AKA D., AKA DREDDY, AKA JUMBO, AKA AZIBO SMITH,
AKA AZIBO SIWATU JAHI SMITH,
*Defendant-Appellant*,

AZIKIWE AQUART, AKA ZEE, NATHANIEL GRANT, AKA
CORRECTIONAL OFFICER STONE, EFRAIN JOHNSON,
*Defendants.*

———————

On Appeal from the United States District Court
for the District of Connecticut

———————

ARGUED: MAY 9, 2023
DECIDED: JANUARY 29, 2024

————————————

Before: LIVINGSTON, *Chief Judge*, RAGGI, and CARNEY, *Circuit Judges*.

————————————

In 2012, appellant Azibo Aquart was found guilty after trial in the United States District Court for the District of Connecticut (Arterton, *J.*) of multiple federal

homicide and drug trafficking crimes and sentenced to death. On Aquart's initial direct appeal, this court affirmed his conviction insofar as it adjudicated guilt, but vacated his death sentence and remanded the case for a new penalty proceeding. *See United States v. Aquart*, 912 F.3d 1, 10 (2d Cir. 2018). When, on remand, the government decided not to pursue the death penalty, the district court resentenced Aquart to a total sentence of life imprisonment, a term statutorily mandated for certain of his crimes of conviction. On this appeal, Aquart argues that the district court erred in (1) relying on the mandate rule in declining to address new challenges on remand to the guilt component of his conviction, and (2) sentencing him for both drug-related murder and drug conspiracy in violation of double jeopardy. The appeal fails because the district court correctly applied the mandate rule, and Aquart's double jeopardy argument is without merit.

AFFIRMED.

––––––––––––––––––

DANIEL HABIB, Federal Defenders of New York, Inc., New York, NY (Monica Foster, Executive Director, Indiana Federal Community Defenders, Indianapolis, IN; David A. Moraghan, Smith Keefe Moraghan & Waterfall, LLC, Torrington, CT, *on the brief*), *for Defendant-Appellant*.

ELENA LALLI CORONADO, Assistant United States Attorney (Sandra S. Glover, Tara E. Levens, Assistant United States Attorneys, *on the brief*), *for* Vanessa Roberts Avery, United States Attorney for the District of Connecticut, New Haven, CT, *for Appellee*.

––––––––––––––––––

2

REENA RAGGI, *Circuit Judge*:

Defendant Azibo Aquart is no stranger to this court. For almost six years, between 2012 and 2018, he pursued an appeal from a judgment of conviction entered in the United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*) for various federal crimes relating to the brutal drug-related murder of three persons: Tina Johnson, Basil Williams, and James Reid. *See United States v. Aquart* ("*Aquart I*"), 912 F.3d 1 (2d Cir. 2018). Specifically, after a five-week jury trial, Aquart was convicted of one conspiracy and three substantive counts of violent crime in aid of racketeering ("VICAR murder"), *see* 18 U.S.C. § 1959(a)(1), (a)(5); three substantive counts of murder in connection with a conspiracy to traffic crack cocaine in an amount proscribed by 21 U.S.C. § 841(b)(1)(A) ("drug-related murder"), *see id.* § 848(e)(1)(A); and one count of conspiracy to traffic 50 grams or more of crack cocaine, *see id*. §§ 841(a)(1), (b)(1)(A)(iii), 846. The same jury that found Aquart guilty of these crimes decided that for the Johnson and Williams murders, which Aquart personally executed, he should be sentenced to death.

In challenging both this capital sentence and the jury's adjudication of guilt on initial direct appeal, Aquart's able and determined counsel filed six briefs presenting some 360 pages of arguments. This court addressed these arguments in a lengthy opinion, affirming the guilt component of Aquart's judgment of conviction in all respects and rejecting the majority of his sentencing challenges. *See Aquart I*, 912 F.3d at 9–70. Nevertheless, because it identified two errors at the capital penalty proceeding that, when considered in conjunction, could not confidently be deemed harmless, the court vacated the sentence component of Aquart's judgment and remanded "for a new penalty proceeding." *See id*. at 70.

On remand, the prosecution decided to forego the death penalty. As a result, Aquart was subject to a statutorily mandated alternative sentence of life

3

imprisonment on each of the three VICAR murder counts, *see* 18 U.S.C. § 1959(a)(1); and a sentence of not less than 20 years and as much as life imprisonment on each of the three drug-related murder counts, *see* 21 U.S.C. § 848(e)(1)(A).  Before any sentences could be imposed, however, Aquart, now represented by different counsel, filed a series of motions raising new challenges to the guilt component of his judgment of conviction and arguing that, in any event, double jeopardy prohibited the district court from sentencing him for both drug conspiracy and drug-related murders.

The district court denied these motions and, on November 1, 2021, entered an amended judgment sentencing Aquart to three mandatory terms of life imprisonment for the substantive VICAR murders, four 40-year prison terms for the three drug-related murders and the single drug conspiracy count, and one 10-year prison term for the VICAR conspiracy, all sentences to run concurrently.

Aquart now appeals this judgment, arguing that the district court erred in (1) relying on the mandate rule in declining to address his new challenges to the guilt component of the judgment, and (2) sentencing him for both drug-related murder and drug conspiracy crimes in violation of double jeopardy.  The appeal fails because, as we explain in this opinion, the district court correctly applied the mandate rule, and Aquart's double jeopardy arguments are without merit.

Accordingly, we affirm Aquart's November 1, 2021 judgment of conviction in all respects.

## BACKGROUND

The horrific details of Aquart's homicide crimes, the compelling trial evidence of his guilt, and the particulars of various proceedings leading to his initial conviction and appeal are detailed in this court's *Aquart I* opinion.  *See* 912

4

F.3d 1. We assume reader familiarity with that opinion and, therefore, do not repeat those facts or the procedural history except as relevant to issues on this appeal.

## I.    Remand

### A.    Aquart's Motions on Remand

After the prosecution withdrew its notice of intent to pursue the death penalty on remand, the district court observed that the statutorily mandated alternative sentence for Aquart's VICAR murders was life imprisonment and, accordingly, set the matter down for what it anticipated would be "a somewhat pro forma [sentencing] proceeding." Status Conf. Tr. at 4:20–21, *United States v. Aquart*, No. 3:06-cr-160 (JBA) (D. Conn. Jan. 13, 2021), ECF No. 1299. That prediction proved wrong because, before resentencing, Aquart filed a trio of motions that, collectively, sought the dismissal of *all* counts of conviction.

In one motion, filed June 2, 2021, he urged dismissal of all VICAR counts, arguing, *inter alia,* that none of the Connecticut murder statutes referenced in the Fourth Superseding Indictment constituted a valid predicate for VICAR murder. In a second motion, filed the same date, Aquart attacked (1) his drug conspiracy and drug-related murder counts of conviction based on defects in the indictment, and (2) the imposition of any sentence on the drug conspiracy count as violative of double jeopardy. In a third motion—initially mailed by Aquart *pro se* on May 19, 2021, but adopted by counsel on June 11, 2021—Aquart sought dismissal of all counts based on alleged speedy trial violations.

In an omnibus response to these motions, the government argued that Aquart's challenges to the affirmed guilt component of his judgment of conviction were barred by the mandate rule. Insofar as Aquart raised sentencing challenges, however, the government urged the court to address and reject his double

5

jeopardy challenge on the merits, but to resentence Aquart on the drug conspiracy count in light of the Fair Sentencing Act of 2010 ("FSA"), Pub. L. No. 111-220, 124 Stat. 2372 (2010).

## B. Denial of Motions and Resentencing

Relying on the mandate rule, the district court, on October 18, 2021, denied Aquart's motions to dismiss. *See United States v. Aquart*, 2021 WL 4859863, at *1 (D. Conn. Oct. 18, 2021). Observing that this court, in *Aquart I*, had "plainly affirmed" Aquart's judgment of conviction as it pertained to guilt, the district court concluded that, on remand, Aquart could not "relitigate the merits of his convictions, whether or not the specific issues he raises now were addressed by the Second Circuit" on his initial appeal. *Id*. at *3. The district court did consider Aquart's double jeopardy challenge but rejected it as without merit. *Id*. at *4, *6– 7. Further, the district court agreed to resentence Aquart on the drug conspiracy count in light of the FSA and imposed a concurrent 40-year prison sentence rather than the original consecutive life sentence. *Id*. at *4–5, *7.[1]

Thus, as earlier noted, on remand, the district court sentenced Aquart to life sentences on each of the three substantive VICAR murder counts, 40-year prison sentences on the three drug-related murder counts and the single drug conspiracy

---

[1] Before the FSA's enactment, a defendant convicted of possessing with intent to distribute at least 50 grams of crack cocaine was subject to a mandatory minimum sentence of ten years and a possible maximum sentence of life. *See* 21 U.S.C. § 841(b)(1)(A)(iii) (2006). Following the FSA, such a defendant faced a lesser mandatory minimum sentence of 5 years and a maximum sentence of 40 years. *See* 21 U.S.C. § 841(b)(1)(B)(iii). In 2012, the Supreme Court held that this more lenient provision applies to offenders whose crack offenses predate the FSA's enactment but who are sentenced after enactment. *See Dorsey v. United States*, 567 U.S. 260, 264 (2012); *United States v. Highsmith*, 688 F.3d 74, 75 (2d Cir. 2012). Because neither party challenges the district court's application of the FSA to Aquart on remand, we do not consider it further.

count, and a ten-year sentence on the VICAR conspiracy count, all terms to run concurrently.

Aquart timely filed notice of this appeal.

## DISCUSSION

### I. The Mandate Rule and Law-of-the-Case Doctrine Preclude Reconsideration of Guilt on Aquart's Affirmed Counts of Conviction

In 2018, this court rejected Aquart's numerous challenges to his guilt adjudication on all counts of conviction and most of his challenges to his capital sentence. *See Aquart I*, 912 F.3d at 17–70. Nevertheless, because of the identification of two errors in the capital sentencing proceeding that, when considered in conjunction, could not confidently be deemed harmless, the court vacated the sentence component of judgment and ordered a limited remand. The limited nature of the vacatur and remand is reflected in the court's decretal language: "For the reasons stated [in this opinion], the judgment of conviction is AFFIRMED as to defendant's guilt; his capital sentence is VACATED and the case is REMANDED for a new penalty proceeding consistent with this opinion." *Id*. at 70.

In this context—*i.e.*, "a remand for resentencing where an appellate court has already fully considered the merits of the conviction"—a trial court, on remand, "generally is foreclosed from reconsidering the underlying merits of the conviction." *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). This foreclosure is dictated by the mandate rule, a branch of the law-of-the-case doctrine, *see United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002), that "rigidly binds the district court," barring it from considering issues "explicitly or implicitly decided on appeal," *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006) (internal quotation marks omitted). The rule is subject to only "narrow exception" for "compelling

7

circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *United States v. Valente*, 915 F.3d 916, 924 (2d Cir. 2019) (internal quotation marks omitted). Such circumstances rarely arise in the context of a limited remand. *See United States v. Malki*, 718 F.3d 178, 183 (2d Cir. 2013) (stating it will be "rare occasion[]" when party "may re-litigate issues foreclosed by a limited mandate").

Aquart nevertheless argues that the district court erred in relying on the mandate rule in declining to consider his new challenges to the affirmed guilt component of his judgment. Alternatively, he urges this court to depart from the law-of-the-case doctrine and itself to consider his new challenges. While the law-of-the-case doctrine does not bind this court with the same "rigidity" that the mandate rule binds the district court, *United States v. Tenzer*, 213 F.3d 34, 40 (2d Cir. 2000), we have consistently recognized it to reflect a "sound policy," *id*. at 39, that we should depart from "sparingly and only when presented with cogent and compelling reasons," *Puricelli v. Argentina*, 797 F.3d 213, 218–19 (2d Cir. 2015); *see United States v. Tenzer*, 213 F.3d at 39 (stating that "major grounds justifying reconsideration are [1] an intervening change of controlling law, [2] the availability of new evidence, or [3] the need to correct a clear error or prevent manifest injustice" (internal quotation marks omitted)). For reasons we now explain, we identify neither error by the district court in relying on the mandate rule nor compelling circumstances warranting an exception from the law-of-the-case doctrine.

## A. New Challenges

Aquart submits that the mandate rule did not preclude the district court from considering his new challenges to the guilt component of his judgment of conviction because those challenges were not at issue on his direct appeal and,

thus, this court could not have decided them, even implicitly. The argument is defeated by precedent, which holds that the mandate rule applies not only to issues explicitly or implicitly decided on appeal but also to issues that were "ripe for review at the time of an initial appeal but . . . nonetheless foregone" by a party. *United States v. Quintieri*, 306 F.3d at 1229 (internal quotation marks omitted); *see United States v. Malki*, 718 F.3d at 182 ("When our remand is limited, the mandate rule generally forecloses re-litigation of issues previously waived by the parties."). As this court has observed, a contrary construction of the mandate rule would effectively eviscerate it by creating an incentive for parties to hold ripe arguments in reserve. *See United States v. Quintieri*, 306 F.3d at 1229; *accord United States v. Ben Zvi*, 242 F.3d at 96. Aquart does not contend that his remand challenges to guilt were not ripe for review on initial appeal. Thus, the district court correctly concluded that their review on remand was barred by the mandate rule.

Cases cited by Aquart warrant no different conclusion. In *United States v. Cirami*, this court reversed the denial of a second motion to vacate judgment pursuant to Fed. R. Civ. P. 60(b)(6) based on the mandate rule because the successive claim was supported by "newly discovered evidence." 563 F.2d 26, 30, 35 (2d Cir. 1977) (internal quotation marks omitted). While newly discovered evidence can also support an exception to the mandate rule in criminal cases, *see, e.g.*, *United States v. Valente*, 915 F.3d at 924, it does not do so here because Aquart did not produce any new evidence to support his guilt adjudication challenges on remand.

Nor does *United States v. Lasaga*, 136 F. App'x 428 (2d Cir. 2005), assist Aquart. There, we upheld a district court's application on remand of upward departures to Sentencing Guidelines that it had found "fully warranted" but unnecessary in imposing the original vacated sentence. *Id.* at 432. But in that case, the initial appeal leading to vacatur effectively "nullified" the district court's

rationale for not applying the warranted upward departures initially. *Id*. Nothing in *Aquart I* nullified the jury's adjudication of guilt on each count of conviction. To the contrary, this court expressly affirmed Aquart's judgment of conviction as to defendant's guilt. *See* 912 F.3d at 70. *Lasaga* is further distinguishable because the arguments there at issue pertained only to resentencing. *See* 136 F. App'x at 430. By contrast, Aquart sought to use resentencing to relitigate the underlying, affirmed, adjudication of his guilt. This attempt is supported by no exception to the mandate rule.

Finally, *United States v. Hernandez*, 604 F.3d 48 (2d Cir. 2010), is inapposite. In there remanding for resentencing, we held that the district court, on remand, had misconstrued our mandate in declining to conduct a *de novo* resentencing. *See id*. at 54 (noting that in 15-year interval between remand and resentencing, "law of sentencing [had] substantially evolved, and [defendant] may have undergone a remarkable rehabilitation"). *Hernandez* did not consider, much less conclude, that on a remand for resentencing—even *de novo* resentencing—a district court is obliged to consider new challenges to the defendant's adjudication of guilt.

Accordingly, the district court correctly concluded that the mandate rule did not permit it, on a remand limited to resentencing, to consider new challenges to the affirmed guilt component of judgment that Aquart failed to raise on direct appeal. Nor do we identify any compelling reason for this court to depart from the law-of-the-case doctrine to hear such challenges on this appeal.

## B. Jurisdictional Challenges

Aquart argues that his indictment challenges to the VICAR and drug-related murder counts of conviction are not barred by the mandate rule or the law-of-the-case doctrine because they are jurisdictional. *See* Fed. R. Crim. P. 12(b)(2) ("A motion that the court lacks jurisdiction may be made at any time while the case is

10

pending."). His argument fails because his challenges do not implicate jurisdiction.

Congress has expressly conferred on "[t]he district courts of the United States . . . original jurisdiction . . . of all offenses against the laws of the United States." 18 U.S.C. § 3231. Thus, so long as an "indictment alleges an offense under U.S. criminal statutes, the courts of the United States have jurisdiction to adjudicate the claim." *United States v. Prado*, 933 F.3d 121, 134 (2d Cir. 2019). The standard for stating an offense is "not demanding." *United States v. Balde*, 943 F.3d 73, 89 (2d Cir. 2019). "[T]o sufficiently charge a crime, an indictment must do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id*. (internal quotation marks and ellipsis omitted); *accord United States v. Frias*, 521 F.3d 229, 235–36 (2d Cir. 2008); *United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000). Further, when, as here, a defendant makes a post-verdict jurisdiction challenge to the sufficiency of an indictment, we "interpret the indictment liberally in favor of sufficiency, absent any prejudice to the defendant." *United States v. Goodwin*, 141 F.3d 394, 401 (2d Cir. 1997) (internal quotation marks omitted).

Applying these principles here, we conclude that Aquart states no cognizable jurisdiction challenge to the VICAR or drug-related murder counts of conviction that would fall outside the mandate rule or law-of-the-case doctrine.

### 1. VICAR Counts

Aquart does not—and cannot—argue that the VICAR counts of his indictment fail to track the relevant statutory language or to state the time and place of the charged murders, which is all that precedent requires for the exercise

11

of federal jurisdiction.[2] Instead, he argues that the Connecticut statutes underlying his VICAR convictions cannot, as a matter of law, constitute murder predicates under VICAR because (1) VICAR's use of the term "murders" references only *generic* murder; (2) the state law violated by an alleged killing must be a *categorical* match to generic murder to qualify as a VICAR predicate; and (3) the Connecticut murder statutes reach more broadly than generic murder and, thus, "cannot serve as valid bases for federal jurisdiction." Appellant Br. at 9–10; *see id*. at 14–30.

---

[2] The VICAR statute states in pertinent part as follows:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, *murders*, kidnaps, maims, assaults, with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual *in violation of the laws of any State or the United States*, or attempts or conspires so to do, shall be punished [as prescribed herein].

18 U.S.C. § 1959(a) (emphasis added).

The VICAR counts of the Fourth Superseding Indictment each allege as follows:

> On or about August 24, 2005, in the District of Connecticut, **AZIBO AQUART** [and various confederates], as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the enterprise [alleged in ¶¶ 1–5 of the indictment], and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, did murder [Tina Johnson (Count Two), James Reid (Count Three), and Basil Williams (Count Four)] unlawfully, willfully, knowingly, and in the perpetration of, and attempt to perpetrate, a robbery, in violation of Connecticut General Statutes, Sections 53a-54a, 53a-54c, and 53a-8a.

Special App'x 43–46.

Whatever the merits of this line of reasoning—a matter we do not pursue—it states no challenge to federal jurisdiction. In *United States v. Cotton*, the Supreme Court expressly held that "defects in an indictment do not deprive a court of its power to adjudicate a case." 535 U.S. 625, 630 (2002). In *United States v. Rubin*, this court interpreted *Cotton* to mean that "challenges to indictments on the basis that the alleged conduct does not constitute an offense under the charged statute are . . . *non-jurisdictional challenges*." 743 F.3d 31, 37 (2d Cir. 2014) (emphasis added).[3]

Aquart urges a narrower reading of *Cotton*, citing *United States v. Peter*, in which the Eleventh Circuit interpreted *Cotton* to pertain only to an "omission from the indictment," and not to call into question that court's precedent holding that "a district court lacks jurisdiction when an indictment alleges only a non-offense." 310 F.3d 709, 714–15 (11th Cir. 2002). This court, however, has expressly refused to "read *Cotton* so narrowly," observing that the Supreme Court there "did not speak merely of omissions; rather, it invoked the broader concept of 'indictment defects.'" *United States v. Rubin*, 743 F.3d at 37 (quoting *United States v. Cotton*, 535 U.S. at 630). Thus, *Rubin* held that whether alleged conduct constitutes the charged offense is a non-jurisdictional question. *See id*. at 37–39; *see also United*

---

[3] Consistent with this view, following *Cotton*, the Federal Rules of Criminal Procedure were amended such that the rule that had permitted an indictment to be challenged for failure to state an offense "any time while the case is pending," Fed. R. Crim. P. 12(b)(3)(B) (2013), was replaced by one requiring the issue to be raised "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits," Fed. R. Crim. P. 12(b)(3)(B)(v). As explained in the Advisory Committee Notes to the amendment, this rule change was prompted by the Supreme Court's "abandon[ment of] any jurisdictional justification" for such an indictment challenge in *Cotton*. Fed. R. Crim. P. 12(b)(3), Advisory Comm. Notes to 2014 Amendments. Aquart's observation that this amendment only took effect during the pendency of his initial appeal does not alter our conclusion that his challenges on remand do not implicate jurisdiction so as to fall outside the mandate rule.

13

*States v. Yousef*, 750 F.3d 254, 260 (2d Cir. 2014) (stating that "[e]ven a defendant's persuasive argument that the conduct set out in the indictment does not make out a violation of the charged statute does not implicate subject-matter jurisdiction"), *abrogated on other grounds as recognized in United States v. Van Der End*, 943 F.3d 98, 104–05 (2d Cir. 2019).

This precedent controls here and compels the conclusion that Aquart's sufficiency challenge to his indictment's VICAR charges raises no question of jurisdiction.

### 2. Drug-Related Murder Counts

Precedent dictates the same conclusion as to Aquart's jurisdiction challenge to the sufficiency of his indictment's drug-related murder counts. Here again, there is no question that the indictment tracks the statutory language applicable at both the time of the alleged 2005 murders and the time of the 2010 Fourth Superseding Indictment. That language had required crack cocaine trafficking to be in an amount of 50 grams or more to state a § 841(b)(1)(A) predicate for a § 848(e)(1)(A) murder.[4] Aquart nevertheless argues that by the time of his 2011

---

[4] Title 21 U.S.C. § 848(e)(1)(A) states in pertinent part,

> [A]ny person . . . engaging in an offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment . . . not. . . less than 20 years, and . . . up to life imprisonment, or may be sentenced to death.

At the time of both the alleged murders and Fourth Superseding Indictment, trafficking in "50 grams or more" of cocaine base, also known as "crack cocaine," was punishable under 21 U.S.C. § 841(b)(1)(A).

The three drug-related murder counts each charged in pertinent part as follows:

14

trial, the indictment no longer stated a viable § 848(e)(1)(A) crime because, in 2010, Congress enacted the FSA, which raised the minimum crack quantity required for a § 841(b)(1)(A) predicate to a § 848(e)(1)(A) murder from 50 to 280 grams.

As a purely jurisdictional challenge, Aquart's attack on the indictment's drug-related murder counts is foreclosed by *Cotton*. The Supreme Court there held that an indictment was not jurisdictionally deficient because it failed to allege "any of the threshold levels of drug quantity that lead to enhanced penalties under § 841(b)," even though the sentencing court subsequently attributed a drug quantity to the defendant that made him eligible for the "enhanced penalties of § 841(b)(1)(A)." *United States v. Cotton*, 535 U.S. at 628.

In any event, Aquart is wrong in arguing that his indictment failed to state

---

> On or about August 24, 2005, within the District of Connecticut, **AZIBO AQUART** [together with various confederates], while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute and to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack cocaine"), . . . did knowingly and intentionally kill and command, induce, procure and cause the intentional killing of [Tina Johnson (Count Five), James Reid (Count Six), and Basil Williams (Count Seven)], and such killing did result.

Special App'x 46–48.

The drug conspiracy count of conviction charged in pertinent part as follows:

> From in and about the fall of 2004, to in or about August 2005, in the District of Connecticut and elsewhere, **AZIBO AQUART** [and various confederates] did knowingly and intentionally conspire to distribute and to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack cocaine") . . . contrary to the provisions of Title 21, United States Code, Section 841(a)(1).

*Id.* at 48.

15

a § 848(e)(1)(A) drug-related murder because the alleged 50-gram crack quantity did not satisfy § 841(b)(1)(A) at the time of *trial*. In *United States v. Guerrero*, this court observed that "[a] murder conviction under 21 U.S.C. § 848(e)(1)(A) requires proof that the defendant was 'engaging' in a drug trafficking offense punishable under 21 U.S.C. § 841(b)(1)(A) *at the time he committed the intentional murder*." 813 F.3d 462, 463 (2d Cir. 2016) (emphasis added). At the time Aquart committed the charged murders, the quantity of crack cocaine "punishable" under § 841(b)(1)(A) was 50 or more grams. Because that is what the Fourth Superseding Indictment charged, the district court's jurisdiction was established. *See id.* at 465 (explaining that § 848(e)(1)(A) crime "is complete at the time of the murder, . . . and it is as of that time that the statute's drug trafficking element is measured"). That conclusion finds further support in *United States v. Fletcher*, wherein this court stated that the "validity" of a § 848(e)(1)(A) conviction "for conduct committed before the Fair Sentencing Act was not affected by changes to § 841(b)(1)(A) that post-date the murder." 997 F.3d 95, 98 (2d Cir. 2021). Implicit in the "validity" of a conviction is the court's jurisdiction to adjudicate the case and enter judgment.[5]

---

[5] Aquart attempts to distinguish *Guerrero* and *Fletcher* on the ground that neither arose in the precise procedural posture presented by his case. *See United States v. Guerrero*, 813 F.3d at 464 (FSA took effect between verdict and sentencing); *United States v. Fletcher*, 997 F.3d at 96 (FSA took effect between guilty plea and sentencing). This effort fails to persuade because, as the language we quote from these cases shows, the statutory interpretation stated therein was not limited to those circumstances.

*Guerrero* and *Fletcher* thus foreclose Aquart's attempt to invoke the rule of lenity. *See United States v. Shellef*, 507 F.3d 82, 106 (2d Cir. 2007) (rejecting lenity argument because "statute, as interpreted by our case law, makes clear that [defendant's] conduct is proscribed"); *see also United States v. Tabb*, 949 F.3d 81, 89 n.8 (2d Cir. 2020) (explaining that rule of lenity is "tool of last resort" not applicable when "traditional rules of statutory interpretation[] resolve any ambiguity").

Finally, Aquart cannot show that he was prejudiced by the indictment's reference to 50 grams or more of crack because, at trial, the prosecution in fact proved the higher 280 gram crack quantity required by the FSA. *See United States v. Goodwin*, 141 F.3d at 401 (requiring post-verdict challenge to sufficiency of indictment to be supported by prejudice). The jury responded affirmatively to a special interrogatory asking whether Aquart engaged in a drug conspiracy involving 280 grams or more of crack cocaine. That finding was, moreover, amply supported by the trial evidence indicating a conspiracy trafficking in many kilograms of crack cocaine.

In sum, Aquart fails to raise any jurisdiction challenge warranting a departure from either the mandate rule or the law-of-the-case doctrine.

## C. Intervening Change in Law

Aquart argues that even if the mandate rule applied to the district court on remand and the law-of-the-case doctrine applies to this court on appeal, an intervening change in controlling law warrants reconsideration of his guilt adjudication on the VICAR counts of conviction. He locates that change in *United States v. Davis*, 139 S. Ct. 2319 (2019), in which the Supreme Court appears to have first applied a categorical, rather than case-specific, approach to determine whether the appealed conviction was for a crime of violence. In so doing, the Court acknowledged that prior cases had applied the categorical approach to assess the violence of crimes of past conviction, while Davis's categorical challenge was directed at the crime "*currently charged*." *Id*. at 2327 (emphasis in original). Aquart argues that this reflects a change in controlling law that allowed him, on remand or now on appeal, to challenge his VICAR crimes of conviction on the ground that the supporting Connecticut murder statutes categorically reach more broadly than generic murder and, thus, cannot serve as VICAR predicates. The

17

argument fails on several grounds.

First, Aquart misapprehends the standard for showing a change in law sufficient to avoid the mandate rule or law-of-the-case doctrine. Citing our decision in *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011), Aquart submits that such a change is evident whenever an intervening Supreme Court decision "casts doubt" on our controlling precedent. Appellant Reply Br. at 13 (quoting *United States v. Plugh*, 648 F.3d at 124). But this language in *Plugh* cannot be read in isolation to suggest that any doubt, however minimal or abstract, is sufficient to reopen all matters previously decided. Indeed, the *Plugh* panel observed that the intervening decision at issue there "made clear" a change in prevailing Circuit law, and "did so in a manner that departed *significantly*" from controlling precedent. *United States v. Plugh*, 648 F.3d at 124 (emphasis added). *Plugh*, moreover, was necessarily informed by earlier, controlling precedent explaining that more than "mere doubt" is necessary to reconsider prior decisions. *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (internal quotation marks omitted). Rather, "[t]he law of the case will be disregarded only when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated." *Id.* (internal quotation marks and citation omitted). That is not this case. This court's affirmance of Aquart's conviction as to guilt was not predicated on any basis called into question by *Davis*. Indeed, this court has never considered whether the categorical approach applies to the VICAR statute.

Insofar as Aquart maintains that, before *Davis*, it was the "law of this Circuit that the categorical approach to predicate crimes applied solely to *prior convictions*," Appellant Br. at 38 (emphasis in original), he is incorrect. Prior to *Davis*, this court, like the Supreme Court, had applied the categorical approach in evaluating crimes of prior convictions. *See Stone v. United States*, 37 F.4th 825, 830 (2d Cir. 2022) (reviewing history and noting that, in general, categorical approach

18

"guides how a court may permissibly consider a defendant's previous or other convictions for the purpose of either determining whether the defendant committed a separate offense . . ., or applying an enhanced prison term"); *United States v. Watkins*, 940 F.3d 152, 162–63 (2d Cir. 2019) (applying categorical approach, in wake of *Davis,* to Bail Reform Act's residual clause defining "crime of violence," *see* 18 U.S.C. §§ 3142(f)(1)(A), 3156(a)(4)(B), but noting that categorical approach "has generally been used in prior-conviction cases"). But in no prior decision did this court ever hold that the categorical approach could not be applied to an appealed crime of conviction. Indeed, this court has long applied the categorical approach to assess whether an appealed count of conviction under 18 U.S.C. § 924(c) constituted a crime of violence under that statute's elements clause. *See, e.g.*, *United States v. Acosta*, 470 F.3d 132, 134–35 (2d Cir. 2006) (applying categorical approach to determine whether appealed § 924(c) conviction was "crime of violence"); *accord United States v. Ivezaj*, 568 F.3d 88, 95–96 (2d Cir. 2009). These cases predated not only *Davis* but also Aquart's trial and first appeal. Thus, while *Davis* may have been the first case in which the Supreme Court used the categorical approach to evaluate the particular crime of conviction being appealed, no pre-*Davis* precedent prevented Aquart from arguing on his initial direct appeal to this court that the categorical approach applied in determining whether the cited Connecticut laws satisfied the murder predicate element for his VICAR counts of conviction.

In seeking to excuse his failure to so argue, Aquart submits that on his initial direct appeal, his focus was on sentencing challenges to his four death sentences. But, as the record shows, on initial appeal, Aquart also raised numerous challenges to the guilt component of his judgment. *See Aquart I*, 912 F.3d at 17–29. A categorical challenge to the Connecticut murder statutes as VICAR predicates would simply have been one more. Moreover, Aquart not only had the

19

opportunity to raise such an argument on his initial appeal.  He also had every incentive to do so because, if he could secure reversal or vacatur of his judgment as to guilt on the VICAR counts, he would be free of *any* sentence, capital or otherwise, for these crimes.

Second, and in any event, *Davis* is of little relevance here because it does not mention, much less construe, the VICAR statute.  Its holding is based on the "text, context, and history" of an entirely different law: 18 U.S.C. § 924(c)(3).  *United States v. Davis*, 139 S. Ct. at 2327.  The residual clause of that statute defines a "crime of violence" as a felony that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."   18 U.S.C. § 924(c)(3)(B).   That language, which the Supreme Court held unconstitutionally vague, *see United States v. Davis*, 139 S. Ct. at 2336, bears no resemblance to the VICAR provision under which Aquart stands convicted, which proscribes "murders . . . in violation of the laws of any State or the United States" related to racketeering.  18 U.S.C. § 1959(a).  Thus, *Davis* sheds little light on whether the categorical approach might apply to Aquart's VICAR murder counts of conviction.

Aquart argues that any differences between *Davis* and this case are immaterial because an "intervening decision need not discuss the precise issue decided by the panel for this exception to apply."   Appellant Reply Br. at 13 (quoting *United States v. Plugh*, 648 F.3d at 124).  While he is correct that meticulous precision is not required on this point, an intervening decision such as *Davis*, bearing only a tenuous relationship to the case at hand, will not easily give rise to a "clear conviction of error with respect to a point of law" on which our previous affirmance of conviction as to guilt was based.  *Fogel v. Chestnutt,* 668 F.2d at 109 (internal quotation marks omitted); *see United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007) (departing from law of the case when intervening Supreme Court

20

decision "uprooted" the principle on which court's earlier decision had relied); *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 9 (2d Cir. 1996) (departing from law-of-the-case doctrine, in part, when intervening Supreme Court decision "expressly rejects" court's prior holding).  It gives rise to no such conviction here.

Indeed, our conclusion that *Davis* does not constitute an intervening change in law requiring a categorical approach to VICAR finds support in decisions of several sister circuits.  In specifically considering whether, after *Davis*, the VICAR statute is subject to categorical analysis, the Fourth Circuit ruled that it was not. *See United States v. Keene*, 955 F.3d 391, 393 (4th Cir. 2020).  The Sixth Circuit cited favorably to *Keene* in similarly holding that the categorical approach does not apply to the RICO statute, *see Johnson v. United States*, 64 F.4th 715, 720, 728 (6th Cir. 2023), a conclusion also reached by the Seventh Circuit, *see United States v. Brown*, 973 F.3d 667, 709 (7th Cir. 2020) (rejecting argument that categorical approach "ought to apply in a RICO prosecution").  The last two holdings are pertinent because, as this court has recognized, "VICAR complements RICO, and the statutes are similarly structured."  *United States v. Pastore*, 83 F.4th 113, 119 (2d Cir. 2023).  We need not here decide whether to adopt the particular reasoning of these courts in reaching their decisions.  Rather, we cite these decisions only as further support for our conclusion that *Davis* represents no clear intervening change in controlling law with respect to VICAR so as to support an exception to the mandate rule or the law-of-the-case doctrine in Aquart's case.

### D. Clear Error or Manifest Injustice

#### 1. VICAR Counts

Reprising his *Davis*-based categorical argument, Aquart asserts that allowing his VICAR convictions to stand would be "blatant error" resulting in "serious injustice."  Appellant Br. at 37.  The argument fails because, for reasons

already stated, *Davis* is hardly relevant to this appeal, let alone indicative of clear error in application of the VICAR statute to murders in violation of Connecticut law. *See supra* at 17–21. Nor can Aquart—who does not profess innocence of the VICAR murders—convincingly argue manifest injustice in the face of compelling trial evidence supporting the jury's finding that he personally killed or aided and abetted in the killing of three bound and gagged victims, *see Aquart I*, 912 F.3d at 10–14 (detailing overwhelming evidence of Aquart's guilt). *See generally United States v. Tiler*, 602 F.2d 30, 35 (2d Cir. 1979) (observing that "generally a movant must at least assert his innocence in order to establish 'manifest injustice'" necessary to withdraw guilty plea under then-existing provision of Fed. R. Crim. P. 32).

### 2. Drug-Related Murder Counts

Aquart next argues that it would be clear error and manifestly unjust to allow his drug-related murder counts of convictions to stand because he "was convicted of and sentenced for a crime that did not exist at the time of trial and sentencing," *i.e.*, murders related to a conspiracy to traffic in *50 grams* or more of crack cocaine in violation of 21 U.S.C. § 841(b)(1)(A). Appellant Br. at 79. Here again, for reasons already discussed, such a clear error/manifest injustice argument is defeated by precedent, *see supra* at 16–17 (discussing *United States v. Fletcher*, 997 F.3d at 98; *United States v. Guerrero*, 813 F.3d at 463), and by the express jury finding that the drug conspiracy pursuant to which Aquart committed the charged murders involved at least 280 grams of crack cocaine, the higher amount punishable under § 841(b)(1)(A) by the time of Aquart's trial, *see supra* at 17.

### 3. Speedy Trial

Aquart did not raise a Sixth Amendment speedy trial challenge to conviction on his initial direct appeal. In faulting the district court for refusing to

consider such a challenge on this court's limited remand, Aquart argues that the delay in bringing his case to trial constituted clear speedy trial error requiring vacatur of *all* counts of conviction in order to avoid manifest injustice.[6] We are not persuaded.

The Sixth Amendment to the Constitution guarantees an accused the "right to a speedy and public trial." U.S. CONST. amend. VI. The right serves to (1) "prevent oppressive pretrial incarceration," (2) "minimize anxiety and concern of the accused," and, most importantly, (3) "limit the possibility that the defense will be impaired." *Barker v. Wingo*, 407 U.S. 514, 532 (1972) (identifying last as "most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system"). Four factors are relevant to a speedy trial claim: (1) length of delay, (2) reasons for the delay, (3) defendant's assertion of his right, and (4) prejudice to defendant. *See id*. at 530. These factors do not tilt so decidedly in Aquart's favor as to demonstrate the clear error or manifest injustice necessary to avoid the mandate rule or law-of-the-case doctrine. Indeed, because the absence of prejudice—the fourth factor—compels that conclusion, our discussion of the other three factors is brief.

The first factor, the length of delay—here, five years[7]—is sufficient to trigger constitutional concern, *see Barker v. Wingo*, 407 U.S. at 530, but it is not

---

[6] Insofar as Aquart also argues that this claim is not barred by the mandate rule because it "was neither expressly nor implicitly determined by this Court in his first appeal," Appellant Br. at 62, we reject that argument for reasons already discussed *supra* at 9–10. *See also United States v. Robertson*, 48 F. App'x 823, 826 (2d Cir. 2002) (concluding that defendant waived speedy trial argument by failing to raise it during first appeal and, thus, could not do so on remand limited to resentencing).

[7] While the parties generally anchor their speedy trial arguments on a delay of 64 months, calculated from the December 7, 2005 date of Aquart's first federal indictment on one

determinative of clear error, particularly given the serious, complex charges against Aquart. *See United States v. Moreno*, 789 F.3d 72, 82 (2d Cir. 2015) (stating that only in "exceedingly rare circumstances" will "length of delay alone support[] a showing of prejudice"); *see also Barker v. Wingo*, 407 U.S. at 531 (explaining that "delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge").

As for the second factor, the reasons for the delay, Aquart argues that it should weigh against the government because it pursued multiple superseding indictments presenting "shifting . . . theories of liability," delaying trial. Appellant Br. at 54.[8]  This is not so evident as to demonstrate clear speedy trial error or

_____

count of conspiring to traffic 50 grams or more of crack cocaine, at times, Aquart appears to suggest a 67-month delay, calculated from his September 2, 2005 arrest for state charges, while the government, at one point, suggests a 53-month delay, calculated from the November 2006 First Superseding Indictment.  We need not resolve this dispute, because our analysis and conclusion are the same whether the delay in bringing Aquart's case to trial was 53, 64, or 67 months.

[8] The relevant chronology can be summarized as follows:

> *December 2005*: Initial federal indictment charges Aquart with conspiracy to traffic in 50 or more grams of crack cocaine.  *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A).

> *November 2006*: First Superseding Indictment adds felon-in-possession-of-a-firearm count to the drug conspiracy charge.  *See* 18 U.S.C. §§ 922(g)(1), 924(e)(1).

> *June 2007*: Second Superseding Indictment adds one conspiratorial and three substantive counts of VICAR murder.  *See id.* § 1959(a)(1) & (5).

> *January 2009*: Notice of intent to seek death penalty filed for substantive VICAR murders.  *See id.* § 3593(a).

manifest injustice compelling vacatur of all counts of conviction.

To explain, we consider the trial delay in parts. We assume that the eighteen-month interval between the initial indictment and the Second Superseding Indictment—the first indictment in which Aquart was charged with murder—is time properly charged to the government. But the ensuing charging instruments—all rooted in Aquart's leadership of a violent drug enterprise— appear more reflective of an expanding, rather than a shifting, theory of culpability, which the government pursued in good faith. Indeed, Aquart does not dispute that, even before return of the Second Superseding Indictment, prosecutors advised him that he was under investigation for murders related to his drug enterprise. This delay occasioned by investigation and eventual charging of such serious crimes is more aptly characterized as "neutral" than "deliberate" and, thus, weighs "less heavily" against the government than would deliberate delay. *Barker v. Wingo*, 407 U.S. at 531 (instructing that "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," while "more neutral reason such as negligence or overcrowded courts should be weighted less heavily," and "valid reason, such as a missing

---

*April 2009*: Third Superseding Indictment adds three substantive drug-related murder counts to six charges in Second Superseding Indictment. *See* 21 U.S.C. § 848(e)(1)(A).

*March 2010*: Fourth Superseding Indictment reiterates nine counts of Third Superseding Indictment pertaining to Aquart, but references Connecticut's felony murder statute as well as the state's murder and accomplice liability statute, as a VICAR predicate. *See* Conn. Gen. Stat. §§ 53a-8(a), 53a-54a, 53a-54c.

*August 2010*: Notice of intent to seek death penalty filed for substantive drug-related murders.

*March 2011*: Jury selection begins.

witness, should serve to justify appropriate delay"); *see also United States v. Cain*, 671 F.3d 271, 297 (2d Cir. 2012) (holding pretrial delays resulting from "practical difficulties occasioned by the complexities of the case" and not government's or court's "bad faith or neglect . . . do not favor a finding that [defendant's] constitutional rights were denied").

As for the further eighteen-month interval between the Second Superseding Indictment and the prosecution's filing of formal death penalty notices, this court has recognized that the decision to seek the death penalty is necessarily "a complex and appropriately deliberative process," *United States v. Black,* 918 F.3d 243, 261 (2d Cir. 2019).[9] There is an obvious public interest in such careful review that justifies a reasonable delay in trial. *See United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008) (holding that "time needed for the Capital Case Unit [of Department of Justice] to decide whether to seek the death penalty" was "valid reason[]" for delay). Aquart points to nothing in the record indicating that the process was deliberately or negligently prolonged in his case. This contrasts with circumstances in the cases he cites. *See United States v. Black*, 918 F.3d at 261–62 (faulting prosecution for inexplicable delay of nearly three years in considering death penalty, losing track of evidence, and repeatedly failing to produce defendants and witnesses for court proceedings); *cf. United States v. Tigano,* 880

---

[9] That process requires not only that local federal prosecutors develop sufficient evidence to support a capital charge, but also that the Department of Justice authorize pursuit of the death penalty, something it does only after a review that includes affording the defense an opportunity to be heard. *See United States v. Black*, 918 F.3d at 287–88 (Cote, *J.*, concurring in part and dissenting in part) (summarizing Department of Justice policy "that federal prosecutors are required to follow" in death-eligible cases, including (1) consultation with Department of Justice Capital Case Section; (2) offering defense counsel "reasonable opportunity to present information which may bear on the decision whether to seek the death penalty"; (3) consultation with victim's family; (4) review by various officials in Department of Justice; and (5) final decision by Attorney General).

F.3d 602, 613–14 (2d Cir. 2018) (charging government with seven-month delay in transporting defendant for competency hearing and with time spent conducting needlessly repetitive and dilatory competency examinations yielding consistent results). Accordingly, this eighteen-month interval does not weigh in favor of Aquart's claim of clear speedy trial error or manifest injustice.

Further trial delay following the prosecution's filing of the first VICAR death penalty notice appears largely attributable to Aquart, who either repeatedly sought or acquiesced in his co-defendants' requests for continuances from September 8, 2009 to March 2011. *See United States v. Black*, 918 F.3d at 262–63 (charging defendants with delays resulting from their extension requests).[10]

Aquart seeks to avoid this last conclusion by now arguing that his trial attorney's litigation strategy was "contrary" to his own expressed wishes. Appellant Br. at 52. It is true that "the right to a speedy trial belongs to the defendant, not to defendant's counsel," such that "a defendant's assertion of his

---

[10] The relevant chronology can be summarized as follows:

*September 8, 2009*: Aquart acquiesces in co-defendant's motion to continue jury selection for six months because of medical issue with counsel and mitigation witness. Court grants and adjourns trial to May 6, 2010.

*March 3, 2010*: Aquart joins in co-defendant's motion for further continuance until September 2010. Court grants over government objection.

*July 6, 2010*: Aquart requests continuance of trial to November 2010, with his counsel disavowing any speedy trial claim.

*August 11, 2010*: Aquart files multiple motions and memoranda requesting another continuance, which court grants to November 29, 2010.

*October 8, 2010*: Defense fails to make timely disclosure of expert evidence as required by Fed. R. Crim. P. 12.2, professing need for more time. Court adjourns trial to March 2011 when jury selection does, in fact, commence.

own right to a speedy trial—even though ignored or contravened by his counsel—is the relevant fact for purposes of Sixth Amendment analysis." *United States v. Tigano*, 880 F.3d at 618. Still, "delays sought by counsel are ordinarily attributable to the defendants they represent." *Vermont v. Brillon*, 556 U.S. 81, 85 (2009). In *Tigano*, we departed from that rule because the record showed that defendant "himself [had] made *very clear* that he desired a speedy trial" by "adamantly, consistently, and explicitly rais[ing] his speedy trial rights at nearly every appearance he made before the court." 880 F.3d at 617–18 (emphasis added). That is not this case, certainly not with respect to any delay following filing of the death penalty notice. As we explain in discussing the next *Barker* factor, there is some record evidence of Aquart raising his speedy trial right *before* he was charged with capital crimes in the Second Superseding Indictment. *See infra* at 29. But there is no evidence of his doing so in this case *after* the return of that indictment so as to support his argument that counsel was then acting contrary to Aquart's expressed wishes in seeking continuances to prepare to defend against such serious charges. Also, to the extent that counsel for Aquart and his co-defendants understandably filed numerous pretrial motions in this complex capital case, the reasonable time required to present, respond to, and resolve those motions is valid delay not raising speedy trial concerns. *United States v. Abad*, 514 F.3d at 274–75 (counting time dedicated to evaluating defendant's pretrial motions as valid delay); *Doggett v. United States*, 505 U.S. 647, 656 (1992) (recognizing that delay due to government's need to oppose defendant's pretrial motions "is often both inevitable and wholly justifiable").

As for the third factor, defendant's assertion of his speedy trial right, the parties dispute whether Aquart satisfactorily asserted his right prior to trial. The record in this case is not akin to those in which a defendant "frequently and explicitly" asserted speedy trial rights. *United States v. Black*, 918 F.3d at 264; *see*

28

*United States v. Tigano*, 880 F.3d at 617–18. Nevertheless, Aquart submits that he demonstrated his desire for a speedy trial as early as 2006 when he refused to sign a speedy trial waiver on the first federal indictment. Moreover, as the government acknowledges, sometime before the June 2007 Second Superseding Indictment, Aquart expressed a desire to proceed promptly to trial on the then-existing charges.[11] Nothing in the record indicates, however, that Aquart reasserted his speedy trial rights in this case any time after the Second Superseding Indictment charged him with more serious capital crimes. Aquart nevertheless asserts that his continuing desire for speedy trial is evident from his 2008 filing of a civil action under 42 U.S.C. § 1983 suing various state prison officials for actions infringing his speedy trial rights with respect to other state prosecutions.

We need not here decide just how Aquart's actions might weigh in the *Barker* balance because, even if we were to resolve that question in Aquart's favor, his inability to demonstrate prejudice—the fourth and most important factor—precludes him from showing the sort of clear speedy trial error or manifest injustice necessary to avoid the mandate rule or law-of-the-case doctrine. *See Barker v. Wingo*, 407 U.S. at 532.

In reaching this conclusion, we are mindful that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett v. United States*, 505 U.S. at 655; *see United States v. Black*, 918 F.3d at 264. Nevertheless, this court "generally ha[s] been reluctant to find a speedy trial violation in the absence of genuine prejudice." *United States v. Cain*, 671 F.3d at

---

[11] The government asserts that it agreed to Aquart's request but warned him that he could still face further charges for murders then under investigation. *See supra* at 25–26. It is not clear from the record whether Aquart then withdrew his request for trial on existing charges or whether that possibility was simply mooted by return of the Second Superseding Indictment.

297; *see also United States v. Cabral*, 979 F.3d 150, 163–64 (2d Cir. 2020) (requiring defendant to show "actual prejudice" where "government acted with reasonable diligence"). Here, Aquart has "failed to articulate prejudice from the delay [in his trial] with any specificity." *United States v. Williams*, 372 F.3d 96, 113 (2d Cir. 2004). Instead, he submits that prejudice in the form of pretrial anxiety can be "presumed from the type of extraordinary pretrial delay at issue here," and that prejudice to his defense is "self-evident." Appellant Reply Br. at 36 n.10, 42. We are not persuaded.

To the extent Aquart urges us to presume anxiety because his "fiancée was pregnant and gave birth to his child during the delay" in his trial, *id*. at 43, that factual premise is belied by his Pre-Sentence Report, which indicates that the child was born in October 2005, before Aquart was under any federal indictment and while he was in state custody. In any event, while personal hardship can be prejudicial, the more probative prejudice for purposes of identifying a speedy trial violation is a "trial-related disadvantage." *United States v. Cain*, 671 F.3d at 297.

On this point, Aquart's argument of self-evident prejudice effectively urges a presumption of prejudice in every case of lengthy pre-trial delay. That, however, would be at odds with the Supreme Court's explicit instruction "to approach speedy trial cases on an ad hoc basis." *Barker v. Wingo*, 407 U.S. at 530; *see id.* at 522–23 (rejecting urged "rigid" categorical approaches to identifying speedy trial violations, observing that speedy trial right is "necessarily relative" (internal quotation marks omitted)). Here, Aquart identifies no favorable evidence or argument that was compromised or lost to him by reason of trial delay. He points to no witnesses who "died or otherwise became unavailable," or to any witnesses' "lapses of memory" that were "significant to the outcome" of his trial. *Id.* at 534 (citing absence of such evidence in concluding that any prejudice to defendant from over five-year delay in trial was "minimal"); *see United States v. Cabral*, 979

30

F.3d at 163–65 (holding eleven-year delay not inherently prejudicial where defendant bore principal responsibility for delay and could not identify "specific prejudice to his defense" (internal quotation marks omitted)). Thus, we conclude that the absence of prejudice here defeats Aquart's claim of a clear speedy trial violation or a manifestly unjust conviction warranting an exception from the mandate rule or law-of-the-case doctrine.

## III. Double Jeopardy

The Double Jeopardy Clause guarantees that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This "command encompasses three distinct guarantees," protecting against (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (quoting *Illinois v. Vitale*, 447 U.S. 410, 415 (1980)). Only the third protection is at issue here, and it pertains even though Aquart's prison terms run concurrently. *See Rutledge v. United States*, 517 U.S. 292, 301–02 (1996); *Ball v. United States*, 470 U.S. 856, 864–65 (1985). Aquart argues that the district court violated double jeopardy in sentencing him on a drug conspiracy count of conviction (Count Eight), as well as on three counts of murder committed while engaging in that conspiracy (Counts Five, Six, and Seven), because the conspiracy crime was a lesser included offense of the murder crimes. On *de novo* review, *see United States v. Weingarten*, 713 F.3d 704, 708 (2d Cir. 2013), we reject the argument as meritless.

### A. Forfeiture

Before explaining that conclusion, we briefly address the government's forfeiture argument. Although, on remand, prosecutors urged the district court to address—and reject—the merits of Aquart's double jeopardy argument, *see supra*

at 6, the government now argues that we should not review this decision on appeal because Aquart forfeited his double jeopardy argument by failing to raise it "before trial, at trial, in post-trial proceedings, or even in his first appeal." Gov't Br. at 80. We need not here decide whether the government itself waived this forfeiture argument because, although a defendant can forfeit or waive double jeopardy rights, *see United States v. Kurti*, 427 F.3d 159, 162 (2d Cir. 2005), we do not think Aquart did so here.

First, a double jeopardy concern as to multiple punishments is properly understood to arise *after* trial because punishment is imposed only after an adjudication of guilt.[12] As this court explained in *United States v. Josephberg*, "[i]f the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment." 459 F.3d at 355. Thus, Aquart did not forfeit his particular double jeopardy *sentencing* challenge by failing to raise it before or during trial.

Second, although Aquart could have raised his challenge after trial or in his first appeal, he at least arguably had no incentive to do so, given that the jury voted to impose the death penalty for two VICAR murder counts and two drug-related murder counts. *See United States v. Quintieri*, 306 F.3d at 1229 ("An issue is not considered waived . . . if a party did not, at the time of the purported waiver, have . . . an incentive to raise it before the sentencing court or on appeal."). In these

---

[12] For this reason, the government's cases in support of its forfeiture argument are inapposite: They concern the distinguishable situation in which a defendant was subjected to successive prosecutions and failed to raise a double jeopardy objection before his second conviction. *See United States v. Leyland*, 277 F.3d 628, 632 (2d Cir. 2002) (rejecting double jeopardy argument to successive prosecutions first raised after guilty plea); *Paul v. Henderson*, 698 F.2d 589, 591–92 (2d Cir. 1983) (holding defendant waived double jeopardy claim by failing to raise it prior to second trial for same offense).

circumstances, Aquart may have thought a double jeopardy argument as to the one drug conspiracy count for which he was sentenced to life imprisonment was irrelevant until the decision in *Aquart I* vacated the capital sentences and remanded for a new penalty proceeding. *See id*. at 1230 (holding defendant not required to raise sentencing issues on appeal that are "irrelevant to the immediate sentencing determination," just in case, "upon remand, the issue[s] might be relevant" (internal quotation marks omitted)); *cf. United States v. Atehortva*, 69 F.3d 679, 685 (2d Cir. 1995) (allowing government to raise novel arguments on remand for resentencing following vacatur of some convictions because, before vacatur, arguments were "purely academic").[13]  Thus, we are not persuaded that Aquart forfeited his double jeopardy argument.

Third, and in any event, because, on remand, the district court addressed the merits of Aquart's double jeopardy challenge after the government had sufficient opportunity to express its views, this court may, in its discretion, review its decision on appeal. *See 32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 102 n.14 (2d Cir. 2019) (holding that issue was not forfeited because "the district court considered the question and rendered a decision on the merits," which "is sufficient to preserve the issue for our review"); *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 39 (2d Cir. 1997) (addressing merits, notwithstanding alleged waiver, where district court reached merits).

---

[13] For reasons already explained *supra* at 20, Aquart did have an incentive on his initial direct appeal to challenge the sufficiency of the charges on which he had been found guilty.

### B. The Drug Conspiracy and Drug-Related Murder Counts of Conviction

Aquart was convicted of three drug-related murders under that provision of 21 U.S.C. § 848 which states as follows:

> [A]ny person engaging in or working in furtherance of a continuing criminal enterprise, or *any person engaging in an offense punishable under section 841(b)(1)(A) of this title* . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

21 U.S.C. § 848(e)(1)(A) (emphasis added). Counts Five, Six, and Seven of the Fourth Superseding Indictment charged that the "offense punishable under section 841(b)(1)(A)" in which Aquart was engaged when he intentionally killed or aided in the killing of Tina Johnson, Basil Williams, and James Reid was a conspiracy to traffic 50 grams or more of crack cocaine. *See* 21 U.S.C. §§ 846 (proscribing drug trafficking conspiracy), 841(b)(1)(A) (providing enhanced penalty for drug crimes involving, *inter alia*, 50 grams or more of crack cocaine). Aquart was separately charged with this conspiracy crime in Count Eight of the indictment, and the district court instructed the jury that to convict Aquart of a murder charged in Counts Five, Six, or Seven, it had to find him guilty of the crack conspiracy charged in Count Eight.

Aquart argues that because the charged crack conspiracy was thus the specified predicate crime for the charged drug-related murders, that conspiracy must be considered a lesser included offense to the § 848(e)(1)(A) murders, for which he cannot stand convicted or be punished without violating double jeopardy. In support, he relies on *Rutledge v. United States*, 517 U.S. 292. That case, however, is not analogous.

34

The *Rutledge* defendant "organized and supervised a criminal enterprise that distributed cocaine," for which conduct the jury found him guilty of both engaging in a continuing criminal enterprise ("CCE") in violation of § 848 and conspiring to distribute cocaine in violation of § 846. *Id*. at 294–95. The Supreme Court ruled that the concurrent life sentences imposed for these crimes violated double jeopardy because "conspiracy as defined in § 846 does not define a different offense from the CCE offense defined in § 848." *Id*. at 300. In short, *Rutledge* holds that double jeopardy precludes multiple punishments for what was essentially the *same* criminal agreement charged as both a CCE under § 848 and a conspiracy under § 846. Following *Rutledge*, this court also has held that "where the alleged CCE is the same enterprise as the [charged drug] conspiracy," *United States v. Polanco*, 145 F.3d 536, 541 (2d Cir. 1998), the conspiracy is a "lesser included offense" of the CCE violation, *United States v. Miller*, 116 F.3d 641, 678 (2d Cir. 1997).

That, however, is not the case here. Aquart was not convicted of engaging in virtually identical criminal conduct violating both § 848 and § 846. Rather, he was convicted of engaging in distinct crimes, one substantive and one conspiratorial, with different objectives: murder in the case of § 848(e)(1)(A); a scheme to traffic drugs in the case of § 846. To be sure, that § 846 conspiracy involved a quantity of drugs that, at the time of indictment, was punishable under § 841(b)(1)(A), making it an appropriate predicate drug offense for § 848(e)(1)(A) murder. But *Rutledge* did not consider whether—much less decide that— punishing a defendant for both a drug-related murder and the drug crime that is the predicate for that murder violates double jeopardy. Indeed, Aquart cites no case in which a court has so held.

This court has previously raised, but not answered, the question of whether § 848(e)(1)(A) drug-related murder and § 846 drug conspiracy crimes "should be

35

viewed as a greater and a lesser-included offense." *United States v. Jackson*, 658 F.3d 145, 151 (2d Cir. 2011).[14] That, however, is not necessarily the determinative inquiry. Rather, in considering whether the same or overlapping conduct may be prosecuted or punished under two different statutes, a court properly looks to legislative intent. *See Garrett v. United States*, 471 U.S. 773, 778–79 (1985). In *Garrett*, a defendant already convicted of unlawful drug importation raised a double jeopardy challenge to further prosecution and punishment for engaging in a CCE to be proved in part by evidence of the importation. *See id*. at 775–76. In rejecting the defendant's challenge, the Supreme Court stated that the fact that the same conduct violates two statutory provisions, each providing for punishment, does not necessarily establish a double jeopardy violation. A court must first "determine whether the legislature . . . intended that each violation be a separate offense." *Id*. at 778; *accord United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999) (explaining that "touchstone" of multiple punishments analysis "is whether Congress intended to authorize separate punishments for the offensive conduct under separate statutes").

To determine whether Congress intended to create separate offenses allowing distinct punishments, courts frequently employ a test derived from *Blockburger v. United States*, 284 U.S. 299 (1932). The Supreme Court there stated that "where the same act or transaction constitutes a violation of two distinct

---

[14] In *Jackson,* this court held that double jeopardy was not violated by retrying a defendant for a § 848(e)(1)(A) drug-related murder count following an initial trial at which the jury had deadlocked on that count but convicted on a § 846 conspiracy count that was the predicate drug crime for the § 848(e)(1)(A) murder. 658 F.3d at 151. It noted that "[w]here the defendant is convicted on both counts, *assuming* they were properly viewed as a greater and a lesser-included offense, it may be that the lesser conviction must be subsumed in the greater," but the *Jackson* defendant had advanced no such argument. *Id.* at 152 (emphasis added).

statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304; *accord United States v. Dixon*, 509 U.S. 688, 696 (1993) (reaffirming *Blockburger* test). Here, the parties do not dispute that Aquart's drug-related murder counts of conviction required proof of a fact *not* required by his drug conspiracy crime, specifically, intentionally killing or aiding and abetting the killing of another person. But they disagree as to whether the drug conspiracy count required proof of a fact not required by the drug-related murder counts.

In urging an affirmative answer, the government submits that proof of a criminal agreement, a necessary element for § 846 conspiracy, is not required to convict a defendant of § 848 drug-related murder because the requisite predicate "offense punishable under § 841(b)(1)(A)" can be a substantive drug crime. Aquart, however, argues that the drug-related murder counts of conviction here required proof of all elements of § 846 conspiracy because the indictment, jury instructions, and verdict sheet confirm that the particular predicate drug crime for his charged § 848 murders was the same § 846 conspiracy charged in Count Eight. We need not resolve this dispute about how the *Blockburger* test might properly apply to the counts of conviction here because we conclude, in any event, that Aquart's double jeopardy challenge fails.

While the identification of one or more distinct statutory elements under the *Blockburger* test can usefully signal Congress's intent to create separate offenses, the test is simply a "rule of statutory construction to help determine legislative intent"; it is "not controlling when the legislative intent is clear from the face of the statute or the legislative history." *Garrett v. United States*, 471 U.S. at 778–79; *see Missouri v. Hunter*, 459 U.S. 359, 368–69 (1983) ("Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a

37

court's task of statutory construction is at an end."); *United States v. Khalil*, 214 F.3d 111, 117 (2d Cir. 2000) (stating *Blockburger* test required only when "statutes themselves do not make the legislature's intent explicit"); *United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994) (eschewing *Blockburger* test when congressional intent "plain from the language of" statute).

In *Garrett*, the Supreme Court concluded, based on "common sense" and the "language, structure, and legislative history" of § 848, that Congress intended for the CCE provisions of § 848 to state separate offenses from any substantive drug crimes under other statutory sections that might be used to prove the enterprise. 471 U.S. at 785, 779, 781 (holding that double jeopardy did not preclude § 848 prosecution based in part on proof of § 952 drug importation for which defendant had earlier been indicted). The Court explained that Congress's intent in enacting the CCE provisions of § 848 was to "reach the 'top brass' in the drug rings" by "add[ing] a new enforcement tool to the substantive drug offenses already available to prosecutors." *Id*. at 781, 784. Given that intent, the Court deemed it "illogical" to require prosecutors to choose between a predicate drug crime and a CCE offense, or to forego prosecution of the latter because a defendant had already been convicted of the former. *Id*. at 785. Having thus concluded that Congress intended a CCE crime to be a separate offense from any underlying drug crime committed in furtherance of the enterprise, the Supreme Court recognized a concomitant "presumption" that Congress "intend[ed] to permit cumulative sentences." *Id*. at 793.

While *Garrett*'s focus was on the CCE provisions of § 848, its reasoning applies with equal force to the statute's drug-related murder provision here at issue. Also applicable here is *Garrett*'s "caution against ready transposition" of lesser-included-offense principles of double jeopardy from "classically simple situation[s]" of conduct equally relevant to two crimes to the "multilayered

38

conduct" involved in CCE crimes. *Id*. at 789. *Garrett* cited *Brown v. Ohio*, 432 U.S. 161 (1977), to illustrate a "classically simple" example of lesser-included-offense principles. 471 U.S. at 789. *Garrett* explained that, in *Brown*, which held double jeopardy to preclude a felony auto theft prosecution of a defendant already prosecuted for misdemeanor joyriding, the Court had been presented with "[t]he very same conduct . . . depending only on the defendant's state of mind." *Id.* at 787 ("Every moment of [defendant's] conduct was as relevant to the joyriding charge as it was to the auto theft charge."). That was not the case with the drug importation and CCE prosecutions at issue in *Garrett*, and it is not the case with Aquart's drug-related murders and drug conspiracy crime.

Indeed, this court has cited *Garrett*'s caution in rejecting double jeopardy challenges to prosecutions and punishments for both multilayer crimes and their predicate offenses, notably, RICO and RICO predicates. *See United States v. Persico*, 832 F.2d 705, 711 (2d Cir. 1987) (quoting *Garrett*); *cf. United States v. Boylan*, 620 F.2d 359, 361 (2d Cir. 1980) ("[N]othing in the RICO statutory scheme . . . would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the underlying or predicate crimes which make up the racketeering pattern." (quoting *United States v. Rone*, 598 F.2d 564, 571 (9th Cir. 1979))). Following these precedents here, we conclude that, just as Congress intended to permit prosecutions and punishments for both a CCE and an importation offense that is part of that CCE, and for RICO crimes and their predicates, so Congress intended to permit prosecutions and punishments for both § 848(e)(1)(A) drug-related murders and the predicate drug crimes to which the murders relate.

Legislative history supports this conclusion. *See, e.g.*, 134 Cong. Rec. 22,607 (daily ed. Sept. 7, 1988) (statement of Rep. McCollum) (referring to § 848(e)(1)(A) provision as "additional tool for law enforcement"); *id.* at 24,923 (daily ed. Sept.

39

22, 1988) (statement of Rep. Donnelly) (noting "provision will provide an important tool in the war against drugs"); *id*. at 30,228 (daily ed. Oct. 13, 1988) (statement of Sen. DeConcini) (supporting provision "to further strengthen our law enforcement efforts against those who traffic and deal in illegal drugs"); *see Garrett v. United States*, 471 U.S. at 782 (consulting legislative history as evidence of legislative intent).

But, more important, statutory text supports the conclusion. At the core of § 848(e)(1)(A) is specific, violent criminal activity: murder. To be sure, § 848(e)(1)(A) punishes murder in a particular context, *i.e.*, when the murderer is engaged in other serious criminal activity, whether a CCE or a drug crime punishable under § 841(b)(1)(A). But the *actus reus* focus of the § 848(e)(1)(A) crime is intentional killing, an injury distinct from and in addition to that addressed by the predicate crimes. *See Diaz v. United States*, 223 U.S. 442, 448–49 (1912) (rejecting double jeopardy challenge by defendant prosecuted first for assault and battery and then for homicide when assault victim died: "although identical in some of their elements," crimes were "distinct offenses both in law and in fact. The death of the injured person was the principal element of the homicide, but was no part of the assault and battery."); *see also Garrett v. United States*, 471 U.S. at 791 (quoting approvingly to *Diaz* in holding that double jeopardy did not preclude prosecuting defendant for ongoing CCE notwithstanding prior prosecution for drug importation crime constituting part of CCE activity). As in *Garrett*, then, it would be illogical to conclude here that Congress intended to require the government to choose between prosecuting a § 846 conspiracy and a § 848(e)(1)(A) murder committed while defendant engaged in the conspiracy, or to preclude any punishment for the conspiracy, which, as in this case, spanned many months because Aquart was punished for murders committed pursuant thereto on a single day.

40

That conclusion is reinforced by the first sentence of § 848(e)(1), which states that the penalties authorized therein for murder—from 20 years to life imprisonment, or even death—must be imposed "[i]n addition to the other penalties set forth in this section." While "this section" plainly refers to § 848, the text signals that Congress, in enacting § 848(e)(1)(A), clearly intended to create a *separate* homicide offense in addition to the drug crimes proscribed even in the same statutory section and to authorize a distinct punishment. The same conclusion logically obtains for a § 848(e)(1)(A) drug-related murder. Had Congress not intended to create a distinct homicide crime in that circumstance, it could simply have amended § 841(b)(1)(A) to enhance penalties for drug trafficking in specified quantities involving murder. After all, that statute was already structured to aggravate drug trafficking sentences in stated circumstances. *See* 21 U.S.C. § 841(b) (raising mandatory minimum sentence from 10 to 20 years when "death or serious bodily injury results from *the use* of [the controlled] substance" involved in the drug crime of conviction (emphasis added)). But Congress did not do so. Instead, it used a single sentence in a different statute, § 848, to criminalize and punish murder when committed with either a CCE or drug-crime predicate. *See Castillo v. United States*, 530 U.S. 120, 124–25 (2000) (concluding that when Congress includes multiple terms "in a single sentence," "structural features strongly suggest" that those terms are related); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 58 (1987) (explaining that when statutory language is contained "in the same subsection, even in the same sentence," that "suggests a connection between" relevant language). Thus, the structure as well as text of § 848 and § 841(b)(1)(A) indicate Congress's intent for § 848(e)(1)(A) to state a homicide crime separate and in addition to any drug-offense predicates. As in *Garrett*, "the presumption when Congress creates two distinct offenses is that it intends to permit cumulative sentences." 471 U.S. at 793.

41

Case law from sister circuits supports this conclusion. *See United States v. Vasquez*, 899 F.3d 363, 383 (5th Cir. 2018) (holding that defendant may be punished for § 848(e)(1)(A) murder "*in addition to* the underlying [conspiratorial and substantive] predicate drug-trafficking offenses" (emphasis in original)); *United States v. Honken*, 541 F.3d 1146, 1154–59 (8th Cir. 2008) (holding successive prosecutions for § 846 drug conspiracy and § 848(e)(1)(A) drug-related murder do not violate double jeopardy); *United States v. Collazo-Apone*, 216 F.3d 163, 199–200 (1st Cir. 2000) (holding that "statutory language of 21 U.S.C. § 848(e)(1) clearly indicates that a drug-related murder conviction is a separate offense from the predicate drug conspiracy offense" for purposes of double jeopardy), *cert. granted and judgment vacated for further consideration in light of Apprendi v. New Jersey*, 532 U.S. 1036 (2001), *convictions affirmed on remand*, 281 F.3d 320 (1st Cir. 2002); *United States v. Snow*, 48 F.3d 198, 200–01 (6th Cir. 1995) (holding that § 848(e)(1) creates "separate offense" from § 846 conspiracy "punishable in addition to, and not as a substitute for," conspiracy (internal quotation marks omitted)); *see also United States v. McCullah*, 76 F.3d 1087, 1104–05 (10th Cir. 1996) (holding § 846 drug conspiracy "separate and distinct from the murder charge" contained in § 848(e)(1)(A) such that "cumulative punishment" for murder in furtherance of CCE was authorized). Indeed, "[e]very court of appeals to consider the question" has concluded that a defendant "may be prosecuted, convicted, and punished" under § 848(e)(1)(A) "*in addition to* the underlying predicate drug-trafficking offenses," and Aquart points us to no case holding otherwise. *United States v. Vasquez*, 899 F.3d at 383 (emphasis in original); *see also United States v. Junius*, 86 F.4th 1027, 1030 n.5 (3d Cir. 2023) (same).

Relatedly, albeit in different contexts, our court has construed § 848(e)(1)(A) to state a separate crime from the underlying CCE or predicate drug offenses, notably rejecting the argument that § 848(e)(1)(A) murder in furtherance of a CCE

"is only a sentencing enhancement and not a separate substantive offense." *United States v. Guzman Loera*, 24 F.4th 144, 155 (2d Cir. 2022). Further, in rejecting requests to reduce § 848(e)(1)(A) drug-related murder sentences based on retroactive amendments to § 841(b)(1)(A) drug quantities, this court has stated that "a violation of § 848(e)(1)(A) is a standalone, substantive offense that is distinct from the underlying drug crime," and "the penalty in § 848(e)(1)(A) is independent of that in § 841(b)(1)(A)." *United States v. Fletcher*, 997 F.3d at 97 & n.2.

Thus, because we identify no merit in Aquart's double jeopardy challenge to his sentence on the § 846 drug conspiracy count of conviction, we affirm that count of conviction along with all others.

## CONCLUSION

To summarize, we conclude as follows,

1. On remand only for resentencing, the district court correctly applied the mandate rule in declining to consider Aquart's new challenges to the affirmed guilt component of his judgment of conviction, and this court identifies no compelling reason to depart from the law-of-the-case doctrine to consider those challenges on this appeal.

2. Because drug-related murder in violation of 21 U.S.C. § 848(e)(1)(A) is a crime distinct from the drug predicates in which a defendant is engaged when he commits such a murder, double jeopardy was not violated by the district court sentencing Aquart to concurrent 40-year prison sentences both for § 848(e)(1)(A) murders and for a predicate § 846 drug conspiracy.

43

Accordingly, we **AFFIRM** in all respects the November 1, 2021 judgment of conviction entered against Aquart in this case.